KNEISEL v. KNEISEL.

WILLS—CONTEST—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.
   On the contest of a will by which testator left his widow the use of his entire property for life, remainder to his heirs, evidence examined, and *held*, that the question of undue influence of his wife should not have been submitted to the jury.

Error to Lenawee; Chester, J. Submitted January 11, 1906. (Docket No. 59.) Decided March 19, 1906.

Barbara Kneisel presented for probate the last will and testament of Peter Kneisel, deceased. The will was allowed in the probate court, and George Kneisel and others, heirs at law, appealed to the circuit court. There was judgment for contestants, and proponent brings error. Reversed.

*John E. Bird* and *John L. O'Mealey,* for appellant.

*B. W. Chandler* and *Smith, Baldwin & Alexander,* for appellees.

OSTRANDER, J.    Appellant is the widow of Peter Kneisel, deceased, and executrix and proponent of his last will.    She assigns error on the proceedings which resulted in a determination that the will should not stand.    Peter Kneisel was twice married and had 14 children, 8 by the first and 6 by the second marriage.    The contestants in probate court were the 8 children by the first marriage.    Two of them appealed from the order admitting the will to probate.    The instrument in question is dated July 9, 1898, is short, and the second clause is the one disposing of property.    It reads:

"I give, devise, and bequeath to my beloved wife, Barbara Kneisel, the full use and control of my estate, both real, personal and mixed, for and during the full term of her natural life, with full power to sell or exchange the personal property from time to time for other personal property, as may be necessary or beneficial for the proper management of the farm and farming lands, and at her decease, then said estate to go to my heirs in equal proportions."

Peter and Barbara were married March 16, 1878.    His children were in age from 17 years to 6 months.    They removed to Michigan, and on June 19, 1878, purchased the farm of 95 acres, a portion of which, 55 acres, is disposed of by the will.    The purchase price stated in the deed was $4,900.    A mortgage for $4,500, a part of the purchase price, was executed on the same day and was released of record February 17, 1894.    July 21, 1885, Peter deeded his wife the homestead of 40 acres, "reserving the full use and control, rents, and profits of said premises for and during the full term of his natural life."    Six of the eight children by the first marriage were sworn for contestants.    Proponent was not sworn but pro-

143 MICH.—25.

duced a large number of neighbors and persons long acquainted with decedent, who gave testimony.

Two grounds of contest were asserted, namely, mental incompetency of the testator, and the undue and fraudulently exercised influence of the wife. The first ground was abandoned during the trial. Indeed, from the testimony produced on the part of contestants, it would be supposed that their purpose, most successfully accomplished, was to prove the mental competency of the testator. It is urged here that the court should have directed a verdict for proponent. The record is certified as containing all of the material testimony given upon the trial. If there is any evidence of the undue influence of the wife, it is found in testimony which tends to show, generally, that she was a woman of persistent purpose, of assertive, and perhaps aggressive, manner, and possessed of a will of her own. That she procured this will to be made, dictated, directly or indirectly, its terms, or is pleased with its provisions, is not attempted to be proved. It is claimed by counsel for contestants that evidence of undue influence is to be found in testimony tending to show a general purpose on her part to get the property for herself, a desire to keep the property from contestants, that she compelled her husband to deed her the homestead, to buy the Blissfield property, denied him spending money, prevented gifts to the contestants, that he had great natural affection for contestants which she perverted and destroyed, that she quarreled with her husband continuously, creating a condition, relief from which would be purchased, that communication with his children was required to be secret, and he was afraid to have speech with them and with neighbors in her presence, that she was unkind to the contestants, that John, one of contestants, not so bright as other children, was not provided for by the father in his will. A careful examination of the record, aided by the brief for contestants, fails to disclose testimony tending to prove any of these things beyond this, that there is testimony by way of decedent's declarations, tending to show

that proponent insisted upon the provision made for her in the deed of the homestead, and was persistent in the idea of securing a home in the village of Blissfield. There is testimony tending to show that she was unkind to contestants, and that she and her husband sometimes quarreled. That Barbara traveled no primrose path in this family is seen by a glance at the testimony of the contestants. One of them is gracious enough to state that which the testimony of each of them, in the light of human experience, makes evident. This witness was a girl of 7 or 8 years when her mother died, and is now a woman of 33. She lived at home until she was 18, and returned again after working out for a time. She says:

"The fact is, considering the size of the family, the fact that Mrs. Kneisel was a second wife, and a stepmother to us eight children, she got along there in the home pretty well. * * * Father and mother, except for those occasional quarrels and unpleasant times, got along well. When the skies were not darkened by these little quarrels, it was as happy a home as any around between father and mother. When I was a little girl, I suppose I had notions that did not agree with Mrs. Kneisel's ideas, and I would have expected as much from my own mother had she lived. * * * After I went away from home, I was sick at one time, and my stepmother came to bring me home, and took care of me and nursed me. I regarded that as rather kind on her part, and, taking it all in all, my stepmother, coming into the family in that way, to mingle with and manage and bring up eight children, it is my judgment now that she was pretty kind to them and got along pretty well with them."

There is no evidence of any fraud. The testimony negatives want of knowledge by the testator of all the conditions which may be supposed to influence the ordinary man in disposing of property. On the other hand, it is undisputed that Barbara has worked early and late, in the house and in the field, has been frugal, interested, has ministered, for different periods of time, to eight children of another mother and to six children of her own. Including the homestead, deeded to her in 1885, the estate con-

sists of 95 acres, the lot in Blissfield, and personal prop-
erty appraised at about $1,300. There is no evidence of
undue influence to be found in the will itself. If there
was undisputed testimony to the effect that Barbara had
proposed the disposition of property which was made, had
argued the matter with her husband and persuaded him
to do precisely what he did do, it would hardly be claimed
that constituted undue, fraudulent influence. It does not
appear that she was present when the will was drawn,
nor that she knew its terms.

The jury should have been instructed that there was no
evidence of undue influence. The judgment is reversed,
and a new trial granted.

MCALVAY, GRANT, and MONTGOMERY, JJ., concurred.

BLAIR, J. I concur upon the ground that the testi-
mony shows affirmatively that, at the time of the execu-
tion of the will in question, the testator was a man of sound
mind, firm in its purposes, and discloses no evidence of
any fraud practiced upon him by proponent. In such a
case, I think the evidence must be clear and positive of
facts and circumstances which reasonably justify the in-
ference that a firm and intelligent mind has been over-
come and dominated by another. The trial judge seems
to have submitted the case to the jury upon the theory
that there was evidence justifying the inference that the
will was so procured. I think this conclusion was based
upon a misapprehension of the testimony. He charged
the jury that, "I think they claim that there is testi-
mony here that she left him at one time and she followed
him around and insisted upon his making these convey-
ances or this will; and that she wouldn't come back unless
he did;" etc. The testimony referred to by the court did
not relate to the making of the will at all but to the execu-
tion of the deed of the homestead in July, 1885, 13 years
before the making of the will. There was testimony tend-
ing to show that proponent procured the deed by threaten-

ing to have testator arrested for slapping her unless he executed it, but the witness who gave this testimony says that: "Before she went over to her sister's, Mrs. Rogers', my father slapped her. He slapped her in the morning and she went over the same day, over to Mrs. Rogers'." The record discloses no justification for Mr. Kneisel striking his wife, and it would, therefore, appear that he was liable to arrest and punishment. The fact, if it were found to be a fact, that he preferred to deed her the homestead, subject to his life estate therein, rather than stand trial, would not warrant the inference that 13 years later, without any similar advantage, she compelled him to make the will.

Most of the material evidence in the case relates to this period culminating in the making of the deed, and there is no testimony tending to connect the procuring of the deed with the execution of the will or tending to show any relation whatever of the proponent to the making of the will. It is claimed, however, that the will shows upon its face that it is unnatural, in not making some special provision for the weak-minded son John. The testimony does tend to show that John was not up to the average in mental power, but it does not show that his mind was so weak as to authorize a jury to impeach the father's judgment as to the provision which should be made for him. The statute commits to the testator the determination of the justice and wisdom of his disposition of his property, and the facts must be very exceptional before a jury can be permitted to substitute their judgment for his, where it appears that his mental faculties are unimpaired.

Neither, in my opinion, can it be reasonably urged that this is an unjust or unnatural will. The children of the first wife were all grown up and, including John, capable of supporting themselves. The proponent had toiled very hard in the house and in the fields to pay off the mortgage, and care for the large family of children. The estate was no more than sufficient to provide for her support and enable her to relax her efforts and take some

comfort in her declining years, which this record shows she has abundantly earned. At all events, the will presents no such unnatural disposition of the estate, in the light of the testimony, as to warrant an inference of undue influence, and I think the court should have directed a verdict for the proponent.