PENINSULAR TRUST CO. v. BARKER.

1. WILLS—TESTAMENTARY CAPACITY.

One has sufficient capacity to make a will where he understands the business in which he is engaged, and the extent and value of his property, and knows who are his relatives, and who would be his heirs at law if no will were made

2. SAME—DELUSIONS.

That a testator was subject to certain delusions does not invalidate his will if they did not dictate its provisions.

3. SAME—UNDUE INFLUENCE—EVIDENCE.

Upon a review of the evidence on the contest of a will, *held*, that there was nothing to go to the jury upon the question either of mental incompetency or of undue influence.

Error to Kent; Adsit, J. Submitted February 3, 1898. Decided March 15, 1898.

The Peninsular Trust Company presented for probate the will of George M. Barker, deceased, which was duly allowed by the probate court. Silas Barker and Imogene Chappell appealed to the circuit. From a judgment for contestants, proponent brings error. Reversed.

*Taggart, Knappen & Denison,* for appellant.

*Maher & Salsbury,* for appellees.

LONG, J. October 13, 1890, George M. Barker made and executed his last will and testament, by which $9,000 was divided among certain church benevolences, $500 given to each of two of his own relatives, including his brother, and $500 each to two of his wife's relatives, and small bequests to others, the residue of his estate being given to the Michigan Association of the Church of the New Jerusalem. This will was duly probated, and, on appeal to the circuit court, the jury found in favor of the contestants, who are the nephew and niece of deceased.

It appears that the testator was married in 1839. He and his wife lived together until 1889, when Mrs. Barker died. No children were born to them. During these years the parties had accumulated considerable property, though poor at the time of their marriage. In 1845 Mr. Barker purchased 40 acres of land, which is now within the corporate limits of the city of Grand Rapids. It was the rapid increase in the value of this land which brought the property of which Mr. Barker died seised. He and his wife were members of the "New" or "Swedenborgian" Church, to which they were in the habit of making regular contributions. Some time prior to 1870 they made a special contribution of $1,000 for the support of the church educational institutions. Mrs. Barker's health had not been good for many years, she being practically helpless, requiring the constant attendance of her husband, which he gave her. In 1876 she was regarded as seriously ill. At this time she was desirous that a portion of the property possessed by them should be given for the

benefit of the church educational institutions. Her husband was apparently equally interested in this benevolence. In order that the gift might be made in his wife's name, he, on July 1,· 1876, conveyed to her practically one-half of his property (himself drafting the deed), for the sole purpose of carrying out their mutual plan of devoting the property to church purposes. They were especially at this time interested in Urbana (Ohio) University. On the same day that the conveyance was made by Mr. Barker to his wife, he wrote the president of the university as follows:

"The health of my wife is gradually failing, and she will probably leave this world at no very distant day. She has property, real estate, in her own right, which, in my judgment, is worth, at a moderate calculation, ten or twelve thousand dollars, which she intends to bequeath to the New Church, to apply towards some of their many uses. She would like very much to help the university, but wants first to see that young women have the same privilege there that men have. Now, will you be so kind as to inform us whether, in your opinion, we have any reason to expect anything of the kind," etc.

The president of the university, Mr. Sewall, replied to this letter on July 5th; and, on receiving this reply, Mr. Barker drew his wife's will, giving to the trustees of Urbana University all the lands so conveyed to her by him, and appointing the president of that university executor of the will. On July 21st following, Mr. Barker wrote the president of the university again, saying:

"Yours of the 5th inst. was duly received, and the statements concerning the desires and intentions of the trustees of Urbana University with regard to granting to females equal privileges with males are quite satisfactory," etc.

On January 29, 1878, Mrs. Barker added a codicil to her will, giving the life use of this property to her husband. Before her death, she and her husband made direct conveyance of two lots to the university. At the time of Mrs. Barker's death, her husband had practically

used up the whole of his own property in the care of his wife and their joint support. Mrs. Barker's will was presented for probate by the university. The heirs of Mrs. Barker contested the probate of the will, and prevailed by reason of the failure to prove by the witnesses thereto that the will was signed by Mrs. Barker in their presence and in the presence of each other. The setting aside of this will left the title of one-half of the real estate in Mr. Barker, the remaining one-half being vested in seven heirs at law of Mrs. Barker. Four of these heirs released their interest to Mr. Barker, but the three others refused to do so. In October, 1890, Mr. Barker filed his bill in the Kent county circuit, in chancery, against these three heirs, asking to have the deed from him to his wife set aside on the ground of total failure of consideration through the noneffectiveness of the will. The court entered a decree adjudging that, by reason of the failure to probate Mrs. Barker's will, the consideration for the deed had wholly failed, and decreeing that the deed be canceled and held for naught. The case was removed to this court, and that decree affirmed. *Barker* v. *Smith*, 92 Mich. 336. After the decision denying the probate of his wife's will, and just prior to the time of filing the bill to set aside the deed given to his wife, Mr. Barker drafted with his own hand a form of will. From this the present will was drawn by his attorney.

On the trial below, the claim of the contestants was that the will was executed under undue influence, and that the testator had no sufficient mental capacity to execute a will. A large amount of testimony was given upon the trial, which we have carefully examined. The proponent of the will asked the court to charge the jury that there was no evidence of undue influence. This the court refused, and submitted the question to the jury. We are satisfied from an examination of the record that the court erred in this refusal to so charge. It appears from the record that it was the intention of Mr. and Mrs. Barker for many years to give the bulk of their property

to these benevolent purposes; that Mr. Barker had in mind, when he deeded this property to his wife, that the gift should be made in her name, as is seen from the letters written to the president of the university at Urbana. After her death, he was willing that her will should be carried into effect; but her heirs contested the probate, and, after the will was defeated, he immediately took steps to have the deed set aside which he had given his wife, bringing the estate back into his own hands; and even before that was accomplished, and evidently in anticipation of such action, he made the will in controversy. It is true that in 1893 he made a codicil to the will, by which he revoked the $500 bequests to the four persons named; but he gave his reasons therefor by saying that he intended in his lifetime to give these persons such property or money as he should deem right, and that in some cases he had already done so.

Upon the question of mental incompetency, the court was asked to instruct the jury:

"6. There is no evidence in the case of any mental unsoundness or of any undue influence operating upon the mind of Mr. Barker at the time of the execution of the original will of October 13, 1890; and such will must therefore be admitted to probate, and must stand as so drawn, except as the same may be changed by one or more of such codicils thereto, in case the jury so find one or more of such codicils duly established."

It appears that Mr. Barker had charge of his property up to July 12, 1894, when he made a power of attorney to the Peninsular Trust Company, to take charge of and manage it. In 1886 he made several conveyances of the real estate. He also made six conveyances in 1888, one in 1890, four in 1891, five in 1892, ten in 1893, six in 1894, and one in 1895, the year of his death. The will was made in 1890. The testimony is overwhelming that he managed the property with good judgment and discretion. Yet it is contended that he had insane delusions; that he on many occasions claimed to have been guided

by his departed wife; that these delusions and other acts of his are evidences of senile dementia.

"17. If the jury find that Mr. Barker had sufficient mental capacity at the time of making his will, or 'at the time of making either or both of the codicils, to understand the business in which he was engaged, to know and understand the extent and value of his property, and how he wanted to dispose of it, and to keep those facts in his mind long enough to dictate his will without prompting from others, he had sufficient capacity to make a will. If he had sufficient mind to clearly discern the nature and extent of his property, and the objects of his bounty, and the scope and provisions of the will, he was mentally competent to make it."

"23. It is established by the undisputed evidence that, at the time of making this will, Mr. Barker did understand the business in which he was engaged, and did know and understand the extent and value of his property, and did know who were his relatives, and who would be his heirs at law if no will were made."

These requests should have been given, for the evidence in the case clearly shows, and without contradiction, that Mr. Barker clearly comprehended the nature and extent of his property and his own business, and who were his relatives and his heirs at law. He had at that time the sole management of his property, had commenced litigation to recover the title, and apparently for the very purpose of making a will for the benefit of the New Church, to carry out the understanding which he and his wife had that the property should be so devoted after his own death. If it were established that the testator was subject to certain delusions, the existence of such delusions would not vitiate the will so long as they did not dictate its provisions. As was said in *Fraser* v. *Jennison*, 42 Mich. 231:

" It is not an uncommon impression that a will must be set aside whenever the existence of any mental disorder at the time of its execution is established. That this is not the law is apparent from the fact that the testamentary dispositions of monomaniacs are often sustained in spite of the mental disorder. When the monomania is con-

ceded, it is only necessary to inquire further whether the provisions of the will are or are not affected by it, and the will stands or falls by that test."

See cases cited in support of this rule.

Counsel also asked the court to charge the jury:

"There is no evidence in the case that Mr. Barker was affected by religious monomania at the time of making the will in question."

This request should have been given. From an examination of the record we are unable to find any evidence that Mr. Barker was influenced in making this will by any monomania, but, rather, that it was made under a long-settled purpose to dispose of his property for the benefit of the New Church.

The court should have directed the verdict in favor of the proponent, and was in error in refusing a new trial.

The judgment below must be reversed, and a new trial ordered.

GRANT, C. J., HOOKER and MOORE, JJ., concurred. MONTGOMERY, J., did not sit.