*In re* DOTY'S ESTATE.

1. EVIDENCE — ADMISSIBILITY — EQUALLY WITHIN KNOWLEDGE OF DECEASED—OPPOSITE PARTIES—WILLS.

   In a will contest case, the widow and daughter of testator, beneficiaries under the will, were not opposite parties within the meaning of 3 Comp. Laws 1915, § 12553, barring their testimony as equally within the knowledge of deceased, although the daughter, with the apparent sympathy of the mother, who was the executrix of the will, was attempting to break the same.

2. SAME—PRIVILEGED COMMUNICATIONS—HUSBAND AND WIFE.

   Testimony by the widow as to conversations and actions of testator, tending to belittle and discredit him, knowledge of which came to her because of the marital relation, and upon which charges that he was subject to insane delusions were based, *held*, barred by the statute (3 Comp. Laws, 1915, § 12555).

3. SAME—HYPOTHETICAL QUESTIONS—COMPETENCY.

   A hypothetical question as to testator's insanity, at the date of making his will, largely made up of the substance of incompetent testimony, which covered a period subsequent to that date, *held*, objectionable, and the answer thereto incompetent.

4. WILLS—COMPETENCY—INSANE DELUSIONS—EVIDENCE.

   Where there is nothing in the record to show that testator, because of claimed delusions, lost his affection for his daughter because she disappointed him by marrying, or that he disliked his wife or lost confidence in her, but, on the contrary, it appears that he retained his affection for his daughter and confidence in his wife, and made such substantial provision for both of them in his will as in his judgment seemed best, such will should not be set aside.

5. SAME—EVIDENCE—SUFFICIENCY—DIRECTED VERDICT.

   *Held*, that, if the fullest probative force is allowed to the competent testimony offered in behalf of contestant, it would not justify the breaking of the will, and that the trial judge should have directed a verdict for proponents.

On opinion of expert witness as basis of question to other witnesses, see note in 29 L. R. A. (N. S.) 537.

On the general rule as to what constitutes capacity or incapacity to make a will, see notes in 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.

Error to Kent; Brown (William B.), J. Submitted October 6, 1920. (Docket No. 23.) Decided December 21, 1920.

Fannie E. Doty, executrix, presented for probate the last will of Payson M. Doty, deceased. The will was allowed in the probate court, and Clara Doty Seeger appealed to the circuit court. Judgment for contestant. The First Methodist Episcopal Church of Ann Arbor, trustee under said will, brings error. Reversed.

*Sheridan F. Master* and *Elvin Swarthout*, for appellant.

*Charles E. Ward*, for appellee.

Moore, C. J. Payson M. Doty was born in "lower town," Ann Arbor, in 1844. He died in Grand Rapids, where he had lived many years, on October 28, 1916, leaving a will which is the subject of controversy here, dated December 30, 1913. When a young man Mr. Doty was admitted to the practice of law, but evidently preferred a business career. The record does not disclose that he inherited any property, but his estate was appraised at upwards of $70,000, and is said to have been more valuable than the amount of the appraisal. About one-half of it was a 99-year lease he had given on real estate in Detroit. The will, with the exception of the signatures of the witnesses, is entirely in the handwriting of Mr. Doty, and there is nothing in the record to indicate that he was assisted by any one in its preparation. It was duly and properly executed and is in legal form. It covers 6 printed pages of the record. Its contents so far as is essential to this controversy are as follows:

"*First.* I direct that all my just debts and all expenses attending the administration of my estate and

all funeral expenses be paid. It is my wish that two granite markers be bought—both alike, one for my son 'Jamie' and one for me—the cost when completed at our graves not to exceed one hundred dollars each.

"*Second.* It is my wish and I direct that any and all property, real—personal or mixed—owned by me at time of my death or that may become a part of my estate, remain as my estate during the lifetime of my wife Fannie E. Doty and my daughter Clare H. Doty, except as hereinafter directed—

"*Third.* I direct that as soon after my death as may seem best—any stock owned by me or any notes or claims due me be converted into cash and the proceeds therefrom be invested in improved real estate or    *    *    *

"*Fourth.* First from the gross income from all my estate must be paid, all fixed charges as taxes—insurances and repairs, as they may become due or needed—

"*Fifth.* After the fixed charges have been provided for then I direct that one-half of the net income from all my estate be allowed my wife Fannie E. Doty for and during her natural time for her sole and separate use and benefit. This provision I make for my wife is to be taken and accepted by her in lieu of dower and in full for all claims against my estate—

"*Sixth.* After the fixed charges have been provided for, then I direct that one-third of the net income from my estate be allowed my daughter Clara H. Doty for and during her natural lifetime for her sole and separate use and benefit.—

"*Seventh.* After the death of my wife—if my daughter is living—then I direct that my daughter be allowed one-half of the net income from all my estate for her sole and separate use and benefit during her natural lifetime.— This is an increase from one (1/3) third to one (1/2) half.

"*Eighth.* After the death of my daughter, if my wife is living—then I direct that my wife be allowed two (2/3) thirds of the net income from all my estate for her sole and separate use and benefit during lifetime—This is an increase from one (1/2) half to two (2/3) thirds.

"*Ninth.* It is my wish and I direct my wife be allowed to use any and all household goods of all kinds

either useful or ornamental that may be in my house at time of my death for as long a time as she may wish to use them— Also the use of the flat without being charged for rent— This means the flat now occupied by me as a home—*not all the building*—at time of death of my wife—if my daughter is living—then my daughter can have all the household goods (that my wife has had to use) to use during her lifetime—I direct that my wife and daughter be allowed to use their share of the net income from all my estate from time to time as it is received and as their needs require— *But*—they *must* limit their expenses to their share of the net income. After the death of my wife, if my daughter is married or should marry, and at any time becomes a widow either 'grass' or 'sod' it is my wish and I direct that as a widow she receive two (2/3) thirds of the net income from all my estate.

"*Tenth.* After my wife and daughter have received their share of the net income from all my estate it is my wish that they pay yearly the balance of the net income for the benefit of the Sunday school in the (fifth ward) 'lower town'—of the city of Ann Arbor, Michigan.

"*Eleventh.* I direct that no property owned by me at time of my death be sold during the lifetime of my wife and daughter without the consent of both my wife and the Judge of Probate for Kent County, Michigan.

"*Twelfth.* I direct that my wife Fannie E. Doty be appointed executrix of this my last will and testament and request that no bond be required of her. That she be allowed ($75) seventy-five dollars per month for her services as executrix for the months she acts as such. This is an extra for her benefit.  *   *   *

"*Fourteenth.* In the years long past and gone I did assist my brother and sisters and through them their children more than I could afford. I sincerely hope my wife and daughter will try in every way possible to make the life of each other happy.

"*Fifteenth.* In the third clause of this will I have provided that under certain circumstances herein named certain real estate may be sold. On the first day of May, nineteen hundred (1912) and twelve I leased to Paul A. Sorge, U. Grant Race, John D. Mackey and Walter F. Haass of Detroit, Michigan,

lot numbered twenty (26) six in section ten (10) of Governor and Judges Plan of the city of Detroit, Michigan, being the premises then known as Nos. 25, 27, 29 Bagley avenue, being situated on the easterly side of Bagley avenue, between Clifford and Park streets, in the city of Detroit, Michigan, for ninety (99) nine years. I consider it advisable that said property and the interests of my estate under said lease be not sold during the lifetime of my said wife and daughter. * * *

"*Sixteenth.* After the death of my wife Fannie E. Doty and my daughter Clara H. Doty, it is my wish and I direct that any and all of my estate then remaining after their death shall be conveyed to 'The First Methodist Episcopal Church' of Ann Arbor, in the State of Michigan, in *trust* to form a fund, the income from which shall be used as follows:

"After the fixed charges have been provided for, then one (1/2) half of the net income derived from any estate of mine remaining shall be used and devoted to maintaining church service and Sabbath school in the so-called 'lower town'—fifth ward—of the city of Ann Arbor, Michigan.

"*Seventeenth.* The other one (1/2) half of the net income to be used for the benefit of any child or children born to my daughter Clara H. Doty in marriage for and during the natural lifetime of such child or children. If my daughter has child or children born in marriage I sincerely wish for such child or children a substantial allowance that such child or children may have good reason to think kindly of me." * * *

In August, 1917, Mrs. Seeger, the only child of Mr. Doty, filed objections to the allowance of the will, averring he was the victim of insane delusions. There was a trial in the circuit court. At the conclusion of the testimony of the contestant, and again at the conclusion of all the testimony, the proponents asked for a directed verdict in their favor. This was denied. The case was submitted to a jury which disallowed the will. The case is here by writ of error. Counsel for the appellee cites the case of *Rivard* v. *Rivard,* 109 Mich., at page 116. We think the case is easily dis-

tinguishable from the instant case and may refer to it later.

Mrs. Doty, the widow, and her daughter, the contestant, were allowed to testify fully and freely as to what was said and done by Mr. Doty. This testimony was objected to upon the ground that they were opposite parties within the meaning of section 12553, 3 Comp. Laws 1915, and upon the further ground as to the widow that she could not testify to conversations and actions knowledge of which came to her because of the marital relation, counsel citing section 12555, 3 Comp. Laws 1915, and cases which will be referred to later. We shall content ourselves with saying that we do not think the first objection was well taken. See the cases cited in the foot-notes to section 12553.

The trial judge, in ruling upon the second objection to the testimony of Mrs. Doty, expressed himself as follows:

"As I said, she can testify to anything that is not privileged. In my way of looking at it, the opinion as to his mental competency certainly cannot be privileged. And so the facts that lead to that opinion must be given to the jury in order that the conclusion may be intelligently understood, and on that basis, I have concluded to let this go to the jury."

We think it an answer to this conclusion to say that if the witness is not competent to express an opinion as to mental competency without testifying to things forbidden by the statute, then the opinion must remain unexpressed.

Under the ruling of the court Mrs. Doty was allowed to give testimony in relation to all acts and conversations of her husband counsel deemed material which occurred during the period of her marital life. This testimony commenced with what Mrs. Doty claimed was an attempted fraud upon the part of her husband in relation to a prenuptial contract, and it continued

in relation to what was done and said until Mr. Doty made his final exit. The provisions of the statute are not ambiguous and have in several instances been construed by this court.

In *Hunt* v. *Eaton*, 55 Mich. 362, Justice CHAMPLIN, speaking for the court, said:

"While I do not consider it necessary to indicate the nature of the communications between husband and wife about which neither is allowed to be examined, I may say generally that the statute aims to protect all those private confidences which the relation of husband and wife holds as sacred, the disclosure of which might introduce strife, malevolence and discord into the married life, and includes every communication between them other than such as involves the title to the separate property of either when it becomes necessary to resort to litigation to obtain, secure or protect the rights of either to such separate property.

"No doubt society is interested in preserving the harmony of the marriage relations and anything which tends to disrupt those relations is to be discountenanced."

The court, however, held in that case that the statute did not apply where the separate property of the wife was involved.

In *Hagerman* v. *Wigent*, 108 Mich. 192, Justice MONTGOMERY, speaking for the court, said:

"In this State it has been frequently held that the surviving husband or wife cannot disclose any communication made during coverture, confidential in its nature, or calculated to reflect upon the character of the deceased. *Maynard* v. *Vinton*, 59 Mich. 151; *Hitchcock* v. *Moore*, 70 Mich. 112; *Carter* v. *Hill*, 81 Mich. 275."

It was also said that the statute did not apply where a wife intrusted property to her husband to be delivered after her death to another person. In *Pierson* v. *Railroad Co.*, 159 Mich. 110, Justice BROOKE, speaking for the court, said:

"Section 10213, 3 Comp. Laws, so far as applicable, is as follows:

" 'Nor shall either [husband or wife], during the marriage or afterwards, without the consent of both, be examined as to any communication made by one to the other, during the marriage.'        -

"In the case of *Hagerman* v. *Wigent*, 108 Mich. 192, this court held the foregoing provision to be but declaratory of the common law, and that it referred only to communications, confidential in character, made by the husband or wife during coverture. Such communications are inadmissible. *Maynard* v. *Vinton*, 59 Mich. 139 (60 Am. Rep. 276) ; *Hitchcock* v. *Moore*, 70 Mich. 112 (14 Am. St. Rep. 474) ; *Carter* v. *Hill*, 81 Mich. 275.

"It is therefore necessary to inquire whether the facts and communications, testified to by Gertrude Wilson, were such as to fall within the inhibition of the statute. We think they were. The law is founded upon sound public policy, and its beneficent operation should not be frittered away by over refinement."

In *People* v. *Bowen*, 165 Mich. 231, Justice HOOKER, speaking for the court, said:

"The statute, 3 Comp. Laws, § 10213, provides that neither (husband or wife) 'shall either during the marriage or afterwards, without the consent of both, be examined as to any communications made by one to the other during the marriage,' etc.

"The defendant was called as a witness on his own behalf, and his counsel questioned him in relation to the conversation that occurred between himself and wife on the occasion of and immediately preceding the homicide, as well as on other occasions when they were alone. He sought to prove admissions or communications expressly conferring or implying her incontinence. The court held that such testimony was inadmissible under the statute mentioned. Counsel for defendant say that there was no reason to believe that the communications between them on these occasions were confidential. It is sufficient to say upon this subject that the presumption should be that the intention

212—Mich.—23.

was that any communication between husband and wife, no other being present, should be considered confidential until the contrary appears. 4 Wigmore on Evidence, § 2336, and cases cited. These parties sought solitude. According to the claim of the defense they were having a last talk before a final separation, and doubtless they were discussing a matter of extreme delicacy and vital importance, closely related to their marital relation, and in our opinion the most liberal construction of the statute would not justify a suspicion even that the communications were not intended to be in marital confidence. 23 Am. & Eng. Enc. Law (2d Ed.), p. 99. They were then privileged, and under the explicit words of the statute the husband could not testify to them without the consent of his wife, which, being dead, she could not give. The privilege secured by this statute survives separation, divorce and death. 4 Wigmore on Evidence, § 2341; 23 Am. & Eng. Enc. Law (2 Ed.), p. 98.

"That the privilege extends to evidence in criminal cases generally admits of no doubt. 23 Am. & Eng. Enc. Law (2d Ed.), p. 95; *People* v. *Warner*, 117 Cal. 637 (49 Pac. 841); *People* v. *Murphy*, 101 N. Y. 126 (4 N. E. 326, 54 Am. Rep. 661); *People* v. *Wood*, 126 N. Y. 249, 271 (27 N. E. 362). In our opinion it was not competent for defendant to testify to the conversation that preceded his homicidal act, or to any other communication between himself and wife regarding the subject, when no other person was present."

We have not overlooked *Leonard* v. *Piggott*, 152 Mich. 436. An examination of the case shows that the separate property of the wife was involved and, of course, it was not within the statute.

In *Re Thayer's Estate*, 188 Mich. 268, it was said the testimony "was not offered and did not show any communications between the parties, but rather the absence of them." In *Barras* v. *Barras*, 192 Mich. 584, it was held that it was not within the statute for Mrs. Barras to testify to what her husband, the grantor, did when he delivered the deed to her for his daughter.

If an illustration was needed of the wisdom of the

statute it is found in the instant case.   Mrs. Doty
filed the will and petitioned that it be probated.   Upon
the trial her counsel stated that she stood neutral, but
she was offered as the first witness for the contestant,
and she proved to be a very willing witness, and the
conclusion from her testimony is irresistible that she
joined forces early with her daughter to break the
will.   When pressed on her cross-examination as to
what she desired, she said:

"*Q.* And was there any suggestions made by any
one that in the meantime you better get out special
administration and then you could determine whether
you wanted to contest the will or not?

"*A.* I did not contest the will, I am not contesting
it now.

"*Q.* Not contesting it now, but you don't want to
see it probated?

"*A.* I want justice done to my daughter.

"*Q.* Well, do you want the will probated?

"*A.* I say I want justice done to my daughter.

"*Q.* That is the best answer that you can give to
that question is it, Mrs. Doty?   I have asked it sev-
eral times.   Do you want to see the will probated?
That can be answered by yes or no.

"*A.* Well, I want justice done to my daughter.   I
feel that she has been—it is an unjust will—

"*The Court:* Do you want the will to stand the way
it is written or—

"*A.* No, I don't, for I don't think it is just to my
daughter."

Her testimony tended to belittle and to discredit Mr.
Doty and, if believed, leaves him a very sorry figure.
Nearly all her testimony, covering more than 100
pages of the printed record, was within the statute as
construed by the cases cited and should not have been
received.

The contestants produced one expert witness who
never had seen Mr. Doty.   A hypothetical question,
which the expert helped prepare, which covers 8 pages
of the printed record, was read to the witness and he

expressed the opinion that Mr. Doty was insane. He also said:

"*Q.* And why then did you find he was insane on December 30, 1913, when these facts were all subsequent to that time?

"*A.* Well, my belief is that the man had an incurable mental disease, paranoia. And cases of paranoia do not recover; that he was insane for a great many years. There are many insane living outside the asylum. * * * I do not know when he became insane, but I believe he was on December 31, 1913. I believe he had been insane 20 or 25 years."

The hypothetical question put to this expert was largely made up of the substance of the incompetent testimony of Mrs. Doty, and was for that reason itself objectionable and the answer was also incompetent.

One of the witnesses offered by the contestant to show that Mr. Doty told him in substance why he was so eager to make money, testified on cross-examination:

"*Q.* Did you ever notice anything that would lead you to believe that he was incapacitated for doing business at all?

"*A.* Not in the slightest.

"*Q.* Or that he was crazy in any way or degree?

"*A.* I don't think that Mr. Doty would be termed in that sense at all. I think he was a shrewd business man.

"*Q.* Did anything ever come up that would lead you to believe that he had insane delusions of any kind?

"*A.* Not on business that I ever saw."

It was the theory of contestant that Mr. Doty had an insane delusion because he often expressed himself from the time she was a little girl that he never wanted to see his daughter married and that when she became a young woman he stated he had rather see her dead than married, and that if she married and had children they would be degenerates, that he gave as a reason that her grandmother had leprosy, that her

mother had given birth to a degenerate son, Orlando, and that his daughter had sores that required her to use a salve.

It was contended the grandmother did not have leprosy but had what contestants called eczema. It was conceded the mother gave birth to a degenerate son before Mrs. Seeger was born, and who was living at the time Mr. Doty died, but it was claimed that his condition was due to the environment surrounding Mrs. Doty during pregnancy and not to heredity.

The witness whose testimony was the most damaging to the side of the proponent aside from that of Mrs. Doty was Mr. Hamilton, who with his wife were on such intimate terms with Mr. and Mrs. Doty that Mrs. Seeger called him uncle and was very fond of him. Mr. Hamilton testified at great length as to conversations with Mr. Doty in relation to Mr. Doty's daughter, his wife and his wife's mother, and how excited Mr. Doty became at these times. He summed up his direct-examination as follows:

"*Q.* What would you say as to his ability in your opinion to deal as a normal man would in making his will wherein the daughter's marriage or anything that might go to her was concerned?

"*A.* On the strength of my former statement, that I believed Mr. Doty was insane on that one subject, I should say that he would be equally insane on the question of making a will or anything else pertaining to or bearing on that subject.

"*Q.* Then, I take it your answer would be that he was not capable of dealing with that subject as a normal man would?

"*A.* To the best of my judgment. * * * I differentiate between Mr. Doty's ability to transact ordinary business affairs and his ability to do anything in which his daughter or his daughter's marriage was concerned by the different attitudes of Mr. Doty in discussing these different questions. Mr. Doty could disagree with you on matters of religion or politics or anything of the kind; he could be very positive in his

statement; at the same time he could discuss them sanely without losing his head entirely; while, on the other hand, any question involving the marriage of his daughter, or the fact that she was married, he could not discuss with any degree of tolerance. And for that reason I differentiate between the two attitudes, when I say that I do believe on any business affair Mr. Doty would be perfectly competent to transact business, but I do believe that he would be prejudiced on anything involving the subject that we have discussed. Now, to just what extent that prejudice might go is a question that I, as a layman, could not answer; but I do know that his mind would be influenced in the one case so that his judgment would be warped and his ability to consider a question of that kind sensibly would be almost impossible."

Upon his cross-examination he testified in part:

"*Q.* Take it in business matters; now, you knew him for a great many years in that regard; what do you say in regard to his capacity as a business man?

"*A.* I think Mr. Doty was capable of looking after his business affairs with credit to himself.

"*Q.* Did you know at any time in his life when he was not capable of looking after his own business matters?

"*A.* No.

"*Q.* I direct your attention to December, in the year 1913, the time when he made this will; did you regard him at that time as not being able to take care of his business matters?

"*A.* I should say he was capable of taking care of his business matters. I was a witness on a previous will that he made. I believe I know his handwriting.

"*Q.* I show you this paper which is marked as exhibit A in this case and ask you to look it over and tell us in whose handwriting you think it is.

"*A.* I should say that was in the handwriting of Payson M. Doty, all through. That looks like his signature. On December 30, 1913—the date of the will— I should say that I was at the Alabastine office.

"*Q.* Why do you say that?

"*A.* I say that because Mr. Doty at the time this will was witnessed, called me up, wanted to know if I was

going to be up town that noon, told me that he wanted me to witness a will for him. I told him that I was not figuring on coming home, asked him if some other time would not do as well. He said no, he wanted it done then, but he said 'it makes no difference; I have got Mr. Caukin and,' he says, 'I can get some one else in the bank to witness it along with Mr. Caukin.'

"*Q.* Did any reason occur to your mind why you should not be a witness to his will at that time, had you been up there and it was convenient?

"*A.* No; I should have witnessed the will.    *    *    *

"*Q.* On December 30, 1913, Mr. Hamilton, do you think that Mr. Doty had mind enough to know what property he had?

"*A.* Yes.

"*Q.* Do you think he had mind enough at that time to know his family and the natural objects of his bounty?

"*A.* Yes.

"*Q.* Do you think that Mr. Doty at that time was a man who was easily influenced?

"*A.* I would not say that he was.    *    *    *

"*Q.* Now, Mr. Hamilton, you have done more or less business with Mr. Doty and were quite familiar with him? Was there any time in his life when, if in a business deal between you and him it became part of the transaction that Mr. Doty should make a deed, for example, of a piece of real estate to you, that you thought he was not competent to make that deed?

"*A.* The question would not have occurred to me.

"*Q.* And by that you mean you would have accepted his deed without any question?

"*A.* Yes."

If Mr. Doty was in the condition mentally that contestants would now have us believe, is it not strange that a business man like Mr. Hamilton, who had known him for years, should not hesitate to sign as a witness a previous will and would not have hesitated to sign as a witness the will now in controversy had he been where he could have done so? The proponents offered a great many witnesses, people who had known Mr. Doty for years and done business with him,

who expressed the opinion that he was a very competent business man and they never saw anything to indicate that he was insane.

Among the witnesses were able attorneys who were interested in the negotiations leading up to and the preparation of the 99-year lease which was to bring to Mr. Doty and those following him a net yearly rental of $3,500 for the first 15 years, and $4,000 a year for the remainder of the term. One of them testified:

"*Q.* From your relationship with him, from those conversations, and from your business intercourse with him, did you at any time see anything, or note anything, that led you to believe he was incapable?

"*A.* Not at all.

"*Q.* To contract?

"*A.* No, sir.

"*Q.* Or had not sufficient capacity to make a will?

"*A.* Quite the contrary, I would say. In my practice of the law I have drafted wills and contracts—many of them.

"*Q.* At any time did you note anything that led you to believe he had any delusion of any kind?

"*A.* No, I did not."

Another of them testified:

"*Q.* Did you find him to be a man easily turned from his opinion or otherwise?

"*A.* Otherwise.

"*Q.* During that time did you at any time notice anything whatever that would lead you to believe he had any delusions?

"*A.* No, sir.

"*Q.* Or that he was insane?

"*A.* No."

Another lawyer testified:

"I have drawn numerous wills and contracts.

"*Q.* During your acquaintanceship with him was there any time, any fact or incident or anything which would lead you to believe he did not have mental capacity to contract?

"*A.* Oh, no. During my acquaintanceship with Mr.

Doty he was always able to make contracts and always able to look out for his own side of the contract."

Another lawyer testified:

"*Q.* Did you at any time notice any eccentricities about Mr. Doty?

"*A.* No, unless you call a keen business mind an eccentricity.

"*Q.* Did you notice any eccentricity which might be classed as an insane delusion?

"*A.* I never did.

"*Q.* Did you ever hear anybody refer to Mr. Doty as being insane in any respect whatsoever?

"*A.* No.

"*Q.* From your relationship with him and business intercourse with him, did you at any time notice anything which would lead you to believe he was not of sufficient mentality to contract?

"*A.* No.

"*Q.* Or anything which would interfere with his capacity to make a will, testamentary capacity?

"*A.* I never did."

Mrs. Doty on her cross-examination said:

"*Q.* Do we understand that you consider him to be insane upon all subjects?

"*A.* No; he was perfectly capable of doing business up to the time he died.

"*Q.* Right up to the time he died?

"*A.* No, I won't say not right up to the time he died; it was within a month or so, I should say."

It is not every delusion that will invalidate a will. In *Peninsular Trust Co.* v. *Barker,* 116 Mich. 333, Justice LONG, speaking for the court, said:

"If it were established that the testator was subject to certain delusions, the existence of those delusions would not vitiate the will as long as they did not dictate its provisions," citing *Fraser* v. *Jennison,* 42 Mich. 231.

See, also, *Leffingwell* v. *Bettinghouse,* 151 Mich., at p. 517.

The language of Justice STEERE in *Re Haslick's Estate*, 195 Mich. p. 438 (Ann. Cas. 1918D, 466), may be helpful here:

"While the trial court admitted the testimony offered relative to deceased's claimed insane delusions that his brothers plotted against him and had tried to rob or kill him, the jury was instructed there was not sufficient proof of insane delusions relating to the brothers to defeat the will, saying in part:

" 'There is no evidence in this case that Gottlieb and Charley were not at August Haslick's house under circumstances from which, by a process of reasoning, August Haslick reached the belief that they were there to rob or poison him with pills, and I, therefore, charge you that you must not consider the evidence as to what August Haslick said about Charley and Gottlieb having been at his house to rob or poison him, as proving an insane delusion in regard to them. The only way you can consider that testimony is the same you would other testimony, merely as to whether or not it has any bearing upon the question of his soundness of mind.'

"Contestants strenuously urge that whether or not deceased was possessed of such delusions as to his brothers was an issue of fact, under the abundant evidence upon that subject, for the jury to decide from all the circumstances shown, and the withdrawal of that question from consideration of the jury was prejudicial error demanding reversal.

"In considering this question it is to be borne in mind that no capricious and arbitrary dislikes, unjust suspicions or prejudice against relatives, or mistaken beliefs as to their feelings and designs towards him and his property, however visionary, nor belief of acts or facts which have any evidential basis constitute in law insane delusions.

" 'If there are any facts however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion, though on a consideration of the facts themselves his belief may *seem* illogical and foundationless to the court, for a will, it is obvious, is not to be overturned because the testator has not reasoned correctly.' 1 Underhill on Wills, § 94.

"The ultimate object of the inquiry is whether an insane delusion, destitute of all evidential support, spontaneously arising in testator's diseased mind, influenced him and operated directly against his brothers when he made his will."

Can it be said in the instant case that, in view of the fact that the grandmother, during the entire life of Clara, had eczema, and that Mrs. Doty had given birth to Orlando, who was admittedly a defective, there were no facts having evidential force upon which Mr. Doty could base his fear that if his daughter had children they might be defective? We think the answer must be in the negative.

It may be well now to consider what Mr. Doty said in connection with what he did. It is claimed that, in order to break off the engagement of his daughter with Mr. Seeger, he said he would tell him that the grandmother was rotten with leprosy, and that Mrs. Doty and Clara both had it. No one was present when Mr. Doty had the interview with Mr. Seeger except themselves. Mr. Seeger's version of what occurred is as follows:

"He said that he was very sorry that our friendship had gone thus far, that if I had spoken to him first he could have saved me the trouble of breaking off our engagement. He told me that Mrs. Seeger's grandmother was an invalid, sick in bed with a blood disease. needed constant attendance, and that it was in the family and Mrs. Seeger had it, she was using salve every night. He told me that her half-brother was mentally deficient, that it might at any time crop out on her or on her children. I think he started the conversation that way. He told his wife and daughter to go downstairs on the front porch and shut the door. He really said that both the mental deficiency and this blood disease would crop out. He said that if I would break off my engagement he would pay me for the ring and other presents I had made her. That is about all I can think of now."

There was no suggestion in his testimony that Mr. Doty used the word leprosy.

Nowhere in the record is it suggested that Mr. Doty threatened to disinherit his daughter if she persisted in keeping the engagement. The evidence is that just before his daughter went to Chicago where she became engaged, Mr. Doty gave her a wrist watch, and when, upon her return, she told her father of her engagement, that he told her that she had deceived him, and if he had known he would not have given her the watch. She also testified that she and her mother knew Mr. Seeger was coming to Chicago, but that they did not tell her father. Can it be said he had no basis for thinking she had deceived him? She also testified that, though she took the watch off her wrist and laid it on the table, her father did not take it up and the record indicates that she still owns it. There is testimony that Mr. Doty used extravagant language to his wife and daughter about the engagement. We now quote from the testimony of the daughter:

"It was in August, 1915, that we had our last conversation, and I told him we decided to be married in October, 1915. Then he said, 'Well, if she gets married she will have to be married by a justice of the peace.' That was not the proper way that most girls are married.

"*Q.* Then after an argument on that, or a discussion about that, he said, 'Well, then go to the minister's house?'

"*A.* Yes, sir.

"*Q.* Now, there wasn't anything wrong in going to the minister's house, was there?

"*A.* No.

"*Q.* And then your mother and yourself, or your mother said that you would be married at your own home?

"*A.* Yes, sir. All during the engagement he would say in different ways 'well, she is of age, I can't force her.'

"*Q.* In other words, he said that if you were bound to get married, why you would have to get married?

"*A.* Yes, sir.

"*Q.* Later the question of the wedding present came up, and you said to him in substance, 'what are you going to give me, daddy, for a wedding present?'

"*A.* Yes, sir.

"*Q.* He said, 'well, now sweetheart,' or 'Dolly, what do you want?'

"*A.* Yes, sir.

"*Q.* You said in substance, 'I want a thousand dollars?'

"*A.* Yes.

"*Q.* He said, 'no?'

"*A.* Yes.

"*Q.* Now, what did he say when he said 'no'; why did he say 'no' to that?

"*A.* I don't know.

"*Q.* Well, then, you forsook getting cash or currency and said, 'well, then, furnish my dining room and my kitchen as it should be furnished?'

"*A.* Yes.

"*Q.* 'And give me that for a wedding present' and he finally consented to do that if you would do it in his way, did he not? That is, he said, 'well, you go and look at things and come back and tell me what the price is, what you want.'

"*A.* Yes.

"*Q.* 'And what the price is, and come back and see me.' So you and Mr. Seeger and you and your mother at various times went down to the furnishing store and draper's and the hardware and picked out what you wanted?

"*A.* Yes, sir.

"*Q.* Got the price on it, the number, etc., so your father could identify it?

"*A.* Yes, sir.

"*Q.* Came back and told him, and he went down to the store shortly thereafter, or to the various stores, and bought those things that you wanted?

"*A.* Yes, sir.

"*Q.* That you had on the list that you gave him, and eventually in his way paid for them?

"*A.* Yes, sir. About $800.

"*Q.* He gave you your trousseau and wedding dinner, rehearsal dinner, and a few of those things, did he not?

"*A.* Oh, yes.

"*Q.* In other words, instead of giving you for a wedding present $1,000 in cash, he gave you equipment, such as furniture and draperies, that cost $800, or in the neighborhood of $800, after he had procured discounts below the prices that you could procure them for?

"*A.* Yes, sir."

There is testimony that, after he consented she might be married from his home, he said he would not attend her wedding. After further talk he consented to attend the wedding rehearsal dinner and went through the part he was expected to perform, protesting he would not give her hand away in marriage. The clergyman who performed the ceremony suggested what was the proper thing for him to do and he did it.

The witnesses are all agreed that upon the wedding day Mr. Doty performed the part allotted him most admirably. No one criticized his conduct adversely. There is nothing to indicate that, when the wedding was an accomplished fact, Mr. Doty did not accept the situation and made no attempt to interfere further. Mr. and Mrs. Seeger began housekeeping on their own account, and Mr. Doty visited them in their new home. We again quote from the testimony of the daughter:

"During the last six months of his life he didn't walk down town. When Mr. Seeger came father was cordial to him. Father never made any complaint about my choice of a husband after the marriage. It was too late then. I can't say father ever showed any affection for him. He would ask Mr. Seeger to do errands for him, and he seemed to appreciate what he did. Father talked to Mr. Seeger and was friendly with him. I don't think they talked much about home life and business.

"My father requested Mr. Seeger to go down to the Battle Creek sanitarium with him in May, 1916; he said he would rather have him go than mother, he thought he was better able to look after him.

"We were told later that father wanted to join the church and be baptized and that he wanted his children present, and so Mr. Seeger and I went over. Mr. Seeger was always included in the invitation.

"*Q.* So that from Mr. Seeger's standpoint you know of nothing wherein he criticized even Mr. Seeger from a personal or a manly or gentlemanly standpoint?

"*A.* No, sir."

Mr. Seeger accompanied Mr. Doty to the sanitarium, and when he was ready to return to Grand Rapids went after him.

There is testimony that during his active business life Mr. Doty did not attend church and narrated his unfavorable experiences with church members and made caustic criticisms of churches and church goers. It is also evident that in his boyhood home, old Ann Arbor, he attended Sunday school and that his parents were associated with the Methodist church. During his lifetime he was a reader of the Bible and memorized portions of it which he often quoted. There is also testimony from which the inference may be fairly drawn that in his later years the teaching he received in his boyhood was revived, that he recalled the church associations of his parents and desired to become a member of the denomination with which they were affiliated; that as a result he received the ordinance of baptism and was received into the church.

If one analyzes and takes the testimony in its entirety it shows that during all her life up to his death her father was very fond of the contestant. His love was characterized by some of the witnesses and by counsel as approaching idolatry. There is no doubt he did not want her to marry but wanted her to remain a bachelor girl, wanted her to take a medical course and to remain an inmate of his house. There is no doubt he was grievously disappointed when she decided to marry and expressed himself in extravagant terms about what he was willing to do to pre-

vent it, but his affection for his daughter never waned. He still regarded her as his Dolly, and his sweetheart, as the witnesses say he loved to call her. There is not a line of competent testimony that indicates that, notwithstanding all his extravagant statements and all his disappointment, his affection for his daughter was ever alienated. Mr. Doty did not dislike or distrust his wife. There is nothing to indicate that he bore her any ill-will. He had confidence in her as is shown by his making her his executrix with a request that she should not be requested to give a bond.

It should not be forgotten that Clara had married a healthy, intelligent man, and that they were both young. Mr. Doty did not, because of any delusion he held, lose his affection for his daughter, and because thereof, disinherit her, as was done in *Rivard* v. *Rivard, supra,* nor did he forget his widow; on the contrary, he provided a very considerable income for each of them for life, and also made provision for any child or children his daughter might have. He made such provision for both wife and daughter as in his judgment seemed best. The judgment so exercised upon this record should not be set aside.

Counsel in his brief says:

"The undisputed evidence in this record is that modern investigation has shown that a person afflicted with what has been heretofore called monomania is likely to show eccentricities, peculiarities and abnormalities in fields other than that directly affected and in which his delusion manifests itself; that it is strictly incorrect to say that such a person is sane on other subjects, although his insanity except upon the one subject may not be apparent; that monomania, therefore, is not a proper term for the affliction and that the more modern investigators speak of it as paranoia.

"The testimony shows that what was once spoken of as monomania is now called paranoia; that the opinion which once prevailed that a man might be insane upon one subject and entirely sane upon every other

no longer exists, although the condition of the patient presents, as it always did, that appearance. The modern opinion in other words is, that what was formerly spoken of as monomania was insanity, in which the manifestations of the disease were confined to one subject.

"In the cross-examination the question is taken up whether an insane delusion must be 'entirely imaginary.' It is developed by the examination that one may have an insane delusion and still have some possible basis on which the delusion is built; that an insane delusion may have some foundation. 'Doty's case belongs to the paranoid.'

" 'This is a form on which a great deal of work has been done the past few years especially. In a paranoid condition first of all the patient is often of an abnormal makeup, has peculiarities, perhaps from early life. They are suspicious, jealous, and out of these peculiarities they develop delusions, often of persecution or infidelity and jealousy. Only when their delusions come in conflict with their surroundings does it become necessary to confine them in institutions. They may do business successfully all their lives. These patients are often cranky, hard to get along with, suspicious and jealous.'   *   *   *

"As to whether Doty's reasoning was somewhat involved in the conclusions he reached, the witness said:

" 'It necessarily would have to be in order to form the delusion, you would have to have a certain amount of reasoning; that is especially a delusion such as you get in paranoia, because they are more or less built up in that way, but they are built up without sufficient foundation.

" 'The reasoning is often absurd and sometimes childish that brings out these conclusions.

" 'It seems to me that if a person imagines anything there must be some little something to start that imagination. We sometimes find in our insane patients delusions we cannot trace to their beginning, but I would not say they were all started out of imagination necessarily. There is probably some foundation some place.'   *   *   *

"Returning to delusions the doctor said:

" 'I believe that there is always some basis, as I stated before, that you can't always find.'   *   *   *

212—Mich.—24.

"Paranoia is sometimes referred to as a reasoning insanity because the delusions found in this condition are systematized, built up by a process of reasoning. There is such a thing as a systematized delusion—built up by a process of reasoning, argument, and often an appeal to previous experience and it enters into a man's makeup and forms a stimulus for his actions.

"A man who has an insane delusion may be cunning in supporting that delusion by what he deems reason. If he has systematized delusion he is usually very active in supporting his ideas by argument, his insane ideas. It is very often true that a man has ability to conceal things tending to disprove his delusion, and sometimes even to people who have experience with the insane, that it is often difficult to bring out the delusions.   *  .  *   *

"The undisputed testimony of an admittedly, competent, modern investigator and expert in this case touches various subjects upon which the courts have expressed their opinion, viz., whether a delusion may be an insane delusion if it is supported by any evidence whatever; whether an insane delusion is in any degree the result of a process of reasoning, etc.

"It will not at this day and age be denied that the subject of insanity has been and is one under careful study and investigation by trained experts, and that through such investigation the subject has become far better understood than formerly, and various theories and opinions formerly held by laymen and medical experts have been demonstrated to be erroneous.   *   *   *

"Is then the judicial opinion, based upon such former testimony, fixed and immovable if modern investigation and thought has demonstrated that the opinions thus given by medical experts were wrong either in whole or in part? Will the judicial opinion cling to that error or will it progress as do other lines of thought with the unfolding of better and more complete knowledge and understanding?

"If the courts came to certain conclusions on these subjects by the aid of expert opinion of medical men which was then the best and most reliable information, will they not for the same reason yield or amend those conclusions when better or more reliable infor-

mation shows that those conclusions were at least partially wrong?

"If the court's opinion of these technical subjects is not to be fixed and unyielding, but is to be guided by the best of experience and investigation, how and when will such modification of judicial opinion come about, manifestly in the same manner that those opinions were first formed and enunciated by the evidence in the individual case.   *   *   *

"History records that insane persons were at one time burned at the stake as witches, judicial opinion at that time being not only that such a thing as witchcraft existed but that an insane person was a witch. Proponent's counsel would hardly disapprove of the changes in judicial opinion which led to the abandonment of these practices, but they do insist that the judicial opinion later formed and announced must never again be changed in the slightest degree no matter how much change may take place in the opinion of the medical profession from whom the courts obtained that opinion."

If the logic of this argument is that other reasons than those now existing should be found for the purpose of setting aside the wills of men capable of acquiring property, it may be well to hark back to the early cases.   Chief Justice CAMPBELL in *Pierce* v. *Pierce*, 38 Mich. 412, 420, 421, said in part:

"We referred in *Latham* v. *Udell, ante,* 238, and we think it is not improper to refer again to the wrongs done under color of law, by the attempts which are becoming so common as to be dangerous to the security of private property, to overthrow wills because they do not suit the notions of those who determine their validity.   The right to make a will as a testator chooses is as sacred as any other right, and a finding that the will is not valid which is based on any other foundation than a conscientious conviction of actual incapacity shown by the testimony is a disgraceful outrage on justice and a plain violation of the oath under which the conclusion is asserted.   It is incumbent on courts to keep out of these cases everything which is merely calculated to create prejudice without throwing

light on capacity, and prevent the establishment of fallacious tests which no one would think of acting on in business transactions, to throw doubt on testamentary capacity."

In *Fraser* v. *Jennison*, 42 Mich. 206, Mr. Justice COOLEY, speaking for the court, said:

"Now, that it has become so common to assail, on allegations of mental disease, the wills of those who in life, in all their business and family relations, were treated as sane, it becomes of high importance that evidence should not be received as suggesting insanity unless it has some legitimate tendency to prove it. We are persuaded that much wrong has unwittingly been done in many cases by allowing misfortunes, family calamities and personal peculiarities to go to the jury as having some necessary tendency to unsettle the mind, and therefore some bearing on the issue of mental soundness. As disturbing causes may be discovered in the family or personal history of almost every living person, the general result is that occasion is found for contesting the validity of almost every will, especially if the estate is sufficient to tempt the endeavor.  *  *  *  Did the deceased have ways differing from most men, and rendering him eccentric? Then surely as most men are sane, he must have been insane.  *  *  *  Give free admission to such evidence, and no man can feel assured that the jury which examines his will in the light of his family history and personal peculiarities, will not adjudge him a madman.  *  *  *

"It may probably be assumed that medical men judge of mental disease by somewhat different standards from those applied by the public generally. The public judge from the conduct which they observe, and which seems to indicate either sense or insane delusions; but the medical expert discovers various indications of unsoundness which would escape others, and which may co-exist with careful, able and prudent management of private affairs.  *  *  *  For legal purposes, incapacity, either criminal or civil, must be judged by manifestations in conduct and language. The circumstances and symptoms in which a physician alone can perceive a tendency towards mental dis-

order, may aid in understanding the manifestations subsequently appearing, but they can have little further value.  *   *   * But nothing can be more illogical than the notion that a perceptible taint of insanity, not evidenced by any delusion or disorder which the public can detect, and not apparently affecting the ability to manage business concerns, shall vitiate all civil acts even though it is conceded that an unquestionable partial insanity shall not have the like consequence, provided the delusion is upon some subject foreign to the act done.   For our part we are not ready to assent to any rule that shall make a derangement of the faculties operate to incapacitate a person from making a valid will when it is neither of a character to render the person incapable of acting rationally in the ordinary affairs of life, nor has it manifested itself in the testamentary provision.   *Meeker* v. *Meeker,* 75 Ill. 260.   Whatever court overturns a will ought to have reasons to stand upon which are within the grasp of the common sense of mankind."

See, also, *Prentis* v. *Bates,* 88 Mich. 567; *In re Shepard's Estate,* 161 Mich. 441; *Powell* v. *Pennock,* 198 Mich. 573.

If the fullest probative force is allowed to the competent testimony offered in behalf of the contestant, it would not justify the breaking of this will.   The trial judge should have directed a verdict as requested by the proponents.

The judgment is reversed and a new trial ordered, with costs in favor of the appellant.

STEERE, BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.