*In re* MARX'S ESTATE.

MARX *v.* MORRISON.

1. WILLS—EVIDENCE—SUFFICIENCY—DIRECTED VERDICT.

On appeal from proceedings to contest the validity of a will, evidence examined, and *held*, to justify the court below in directing a verdict for proponents.

2. SAME—EVIDENCE—COURT FILES—APPEAL AND ERROR.

In proceedings to contest a will, the court below properly rejected certain records and files of the circuit and probate courts of Wayne county, offered in evidence by contestant, where, if everything claimed for them by contestant is granted, the most that can be said is that they establish her as a creditor of decedent.

3. SAME—BENEFICIARIES.

It is for testator to select the objects of his bounty, and not for courts and juries.

4. EVIDENCE—TRIAL—HYPOTHETICAL QUESTIONS—PHYSICIANS.

In proceedings to contest a will, a hypothetical question, propounded to a physician, which assumed facts not testified to, and omitted material facts which had been testified about, was properly rejected by the court below.

5. VEXATIOUS APPEALS—DAMAGES—STATUTES.

On appeal of contestant from the judgment of the court below sustaining the validity of the will, where the record shows that the contest of the will was entirely without merit and had no basis either in law or in fact, the Supreme Court will affirm the judgment and award $100 damages against contestant for the vexatious appeal, under section 13705, 3 Comp. Laws 1915.

Error to Wayne; Des Voignes, J., presiding. Submitted April 12, 1918. (Docket No. 72.) Decided June 3, 1918.

John J. Marx and others presented for probate the last will of Frank Marx, deceased. The will was allowed in the probate court, and Gracie Marx Morrison

appealed to the circuit court. Judgment for proponent on a directed verdict. Contestant brings error. Affirmed.

*James H. Pound,* for appellant.

*Allan P. Cox,* for appellee.

FELLOWS, J. The testator, Frank Marx, an unmarried man, executed the will in question some eight months prior to his death. He was 49 years old at the time of his decease. The will contained several specific bequests to relatives, friends, employees, and for religious and educational purposes, a specific devise of his interest in the Marx homestead to his sister and her daughter, and left the residue to his two brothers, John and William, and his two sisters, Emma and Henrietta, with the proviso that William's heirs should not take his share if William did not survive testator, but the heirs of the others should take by right of representation. Contestant is the daughter of Joseph Marx, a deceased brother of testator. She contests this will on the grounds of mental incapacity, undue influence, and:

*"Third:* Because the deceased forgot the existence of this contestant at the time he made the paper writing, and being afflicted with as many boils as Job, the torture of which perverted his mind.

*"Fourth:* Because the paper writing offered as the last will and testament of Frank Marx, deceased, was the produce of prejudice and a lack of comprehension of the laws of this State and of God's as well.

*"Fifth:* Because the paper writing offered in evidence to this court is the result of prejudice and fanaticism wholly ungrounded in fact and unjust.

*"Sixth:* If deceased entertained any prejudice to this contestant it was the result of an unjustified wrong he did contestant's father without cause or excuse at a time contestant was a babe in arms." * * *

The will was admitted to probate by the probate

court of Wayne county and contestant appealed. Upon the trial at the circuit some 23 witnesses were sworn by her, and three and one-half days consumed in putting in her proof, at the close of which the court directed a verdict sustaining the will; contestant brings the case here.

The witnesses called by contestant establish beyond question, either by their testimony given on direct or cross-examination, that Mr. Marx, the testator, was a man of affairs, successful in a high degree as a business man, leaving an estate said to be worth in excess of a hundred thousand dollars; that he was liberal to a fault, traveled extensively, and was competent to successfully conduct his large business affairs and to make the will in question. No witness testified to a single act in his entire life showing, or tending to show, any want of mental capacity, any insane delusions, any impairment of mental vigor, or any fact justifying the submission of the question of mental capacity to the jury.

Nor are we able to find in this record any evidence having the slightest tendency to establish undue influence. Indeed, the testimony of contestant herself refutes the claim that he was a man who could be influenced to do anything contrary to his own inclination. A few excerpts from her testimony demonstrate this. She testifies:

"*Q.* Mrs. Morrison, was your uncle a man determined—
"*A.* He was.
"*Q.* He was?
"*A.* Yes, sir.
"*Q.* He was not easy-going?
"*A.* No, sir.
"*Q.* Pretty hard man to control if he made up his mind?
"*A.* I should judge he was.
"*Q.* Very difficult man to influence, wouldn't you say so?

"*A.* I should judge he was.  *  *  *

"*Q.* But he was a man, in his life there, as you saw, who was in the habit of giving orders rather than taking them, isn't that true?

"*A.* He gave orders, yes.

"*Q.* The rest of them did what he wanted them to do?  *  *  *

"*A.* I never saw him around any one who could get him to do anything."

Upon the argument much time was devoted by counsel to the claim that deceased had an unnatural hatred for contestant. Much space in the brief is devoted to this subject. It ought not to be necessary for us to say that cases must be disposed of on the record as made, and failure of proof on a given subject may not be supplied by the unsupported statements of counsel. It is one of the functions of counsel to draw legitimate inferences from the facts proven; but it is not one of the functions of counsel to enlarge the record by voluntary and unsupported statements of facts in the brief, statements setting up facts which have been testified to by no witnesses, nor properly inferable from those established. When we turn to the record we find no evidence of an unkind word by deceased to, or of contestant, or by any member of the Marx family. Contestant herself testifies that she was always treated pleasantly and kindly whenever she went there. When deceased returned from Europe he remembered her with a souvenir of his trip, bought abroad; on one occasion when she contemplated building he offered to assist her in procuring the money; some five months after the making of the will in question he contracted with contestant and her mother to buy 20 acres of land received by them from the estate of Marx senior, and which was bringing them at the time an income of from 40 to 60 dollars per year, agreeing to pay $10,000 for the property and making a substantial down payment; they had talked with him about this

property before; while no provision was made for her in the will he had taken out insurance upon his life to the extent of $500 in her favor, which she refused to receipt for and accept after his death. In the final analysis she complains because the members of the Marx family have not visited her, and when she met them she had to speak first. Her husband, called by her as a witness, testified on direct examination, in answer to questions propounded by her counsel:

"*Q.* When John Marx talked of your wife what name did he apply to her?
"*A.* Gracie.
"*Q.* Gracie. Now, then, now, having answered that question, what was said by either himself or family—what opinion they had of Gracie?
"*A.* I always understood them that she was all right.
"*Q.* Did he say so?
"*A.* Yes, he has; he has always said so to me."

In the face of this record, the claim that this will was the product of an unnatural hatred entertained by the testator, or entertained by any member of the Marx family, and vented upon contestant by undue influence over testator is preposterous and without foundation.

In the will testator gave a bequest to the children of his deceased brother, Nicholas, and made the provisions with reference to the homestead we have referred to; but to no other nephew or niece did he give anything. How many there were does not appear, but that there were others than contestant the record discloses. It was for the testator to select the objects of his bounty. His to give and his to withhold. What nephews or nieces, if any, should enjoy that bounty was for his determination, not for courts and juries.

But it is urged that testimony was excluded by the court which, if received, would have sustained contestant's claim. It therefore becomes necessary to ex-

amine the tendered proofs. The testimony went far afield and took an exceptionally wide range; but contestant insists that some was rejected which has a bearing on the issues in the case. The most strenuous insistence grows out of the refusal of the court to receive certain records and files of the circuit and probate courts of Wayne county. These are not made a part of the bill of exceptions and the statement as to what these cases were about is not as clear as might be desired. One of these files, and this one seems to have been received, although its materiality does not become apparent, was the divorce proceedings between contestant's mother and a man named Sutherland, in which the decree was granted in 1899. Another was a contest by contestant's mother over the admission of the will of her father, Joseph Marx, to probate; this appears to have been in 1896 or 1897, and the testimony shows the contest was settled. Another, was the contest upon the will of decedent's mother. Another, counsel claims, was over the custody of contestant between her mother and grandmother; the record is not clear as to this case. Another, was a suit brought by William Marx and Nicholas Marx against deceased and others. Another, was a suit brought in 1908 by contestant's mother, as administratrix of Joseph's estate and as guardian of contestant, against deceased and others. We should not, by considering the assignments of error covering the rejection of these files, be regarded as approving the manner of submitting these questions to this court. The bill of exceptions should show what these rejected documents are in order that we may better understand their materiality. These files could scarcely be expected to evidence more than the claims of the parties, but if, by the wildest stretch of imagination, we accept everything claimed for them by counsel, that they show a withholding or attempted withholding

from contestant of anything from her grandmother's estate, or her father's estate, which rightfully belonged to her, they do not have any tendency to prove undue influence in procuring the will in question, or mental incapacity of the testator at the time he executed it, either as a result of mental decay or unnatural hatred amounting to monomania. If we take everything claimed for them by counsel, that they show a withholding from contestant of anything rightfully hers, the most that can be said is that they establish her as a creditor of deceased. If so, the courts have been, and, unless barred by lapse of time, still are open to her for the enforcement of her claim; this is not the proper forum for the adjustment of such claims. One is not required to will his property to his creditors at the peril of having his will set aside. The court very properly rejected these files.

Contestant called a physician and propounded to him a hypothetical question. This question assumed facts which had not been testified to and omitted material facts which had been testified about, and was objected to on that ground. The objection was sustained; but the court indicated to counsel the proper lines along which he would receive such expert testimony. Instead of accepting such suggestion counsel retorted:

"Your honor, please, I have practiced law 42 years and I propose to play my own hand without any assistance."

The court having properly ruled upon the question, and having properly indicated along what lines counsel might proceed, we cannot understand upon what theory a reversal should be ordered on this ruling.

We have examined all the other errors assigned. None of them possess any more merit than those discussed.

We have read this record containing 281 pages with care, and find between its covers no scintilla of evi-

dence supporting, or tending in any way to support, the contest of this will. This contest is entirely without merit and has no basis, either in law or in fact. As a vehicle for an unsuccessful attempt to discredit the memory of the deceased it has performed its function.

Section 13705, 3 Comp. Laws 1915, provides:

"Upon appeals from probate courts to a circuit court, and from the circuit courts to the Supreme Court, costs shall be paid by the appellant or appellee, as shall be directed by the court to which the appeal is made; and upon affirming any sentence, determination or decree, or upon the appeal being discontinued or quashed, the court may, in its discretion, award damages for the delay and vexation caused by such appeal."

This court has on occasions awarded damages for vexatious appeals. *Campau* v. *Campau*, 25 Mich. 127; *Heath* v. *Waters*, 40 Mich. 457; *Snow* v. *McCracken*, 107 Mich. 49. This should not be done except in plain cases. The contest in the instant case has been without merit from its inception. It has been heard in three courts, entailing large expense upon the estate with no substantial foundation for its beginning, and no basis for its continued prosecution. It is clearly within the purview of the statute.

The judgment of the court below is affirmed, with an award of $100 damages for the vexatious appeal.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, STONE, and KUHN, JJ., concurred.