346 Mich. 227 (1956)
77 N.W.2d 790
In re CALHOUN ESTATE.
ROWE
v.
BURRELL.
Docket No. 24, Calendar No. 46,663.
Supreme Court of Michigan.
Decided June 28, 1956.
Lawrence, Ulrich, Tripp & Barense (Nelson S. Shapero, of counsel), for proponents.
Wilson & Keyes, for contestants.
BLACK, J.
This will contest arrives here on appeal from the Washtenaw circuit. At time of submission the case was assigned to Mr. Justice REID. It was reassigned to the writer May 14, 1956.
Anna R. Calhoun, a school teacher in earlier life, died at Ann Arbor in October of 1952. She was 82 years old at death. Her husband died many years ago. There were no children of the marriage. During the last year of her life she was able for the most part to "get about" with assistance and take occasional trips for business and on one occasion pleasure purposes. Her health and vigor were definitely impaired during final years and it is said that she did not have sufficient mental capacity *229 to comprehend and execute the instrument we now appraise for legal worth.
Mrs. Calhoun entered the Tecumseh hospital in December of 1951. Thereafter and commencing in early January of 1952, her remaining life was spent in nursing homes. She entered the Evans Marshall home at Ann Arbor March 5, 1952, and remained there until a few days prior to death. The instrument in question was executed at the Evans home shortly after Mrs. Calhoun went there.
Mrs. Calhoun was personally acquainted with attorney Robert D. Ulrich, scrivener of the instrument in question. When Mr. Ulrich was a boy his parents were next-door neighbors of Mr. and Mrs. Calhoun. The acquaintance, apparently on a most friendly basis, continued from 1928 until the time of Mrs. Calhoun's death. A day or so prior to March 7, 1952 Mrs. Calhoun sent for Mr. Ulrich. The message  to effect that Mrs. Calhoun wanted a will made  was conveyed to him by the proponents, both being nephews of Mrs. Calhoun.
Mr. Ulrich went alone to the Evans home March 7, 1952. The usual conference between attorney and client took place preparatory to the drafting of a will. Neither of the proponents was present. Mr. Ulrich carefully questioned Mrs. Calhoun as to the nature of her property and intended objects of bounty including the names of nearest relatives. During the conference the usual lined tablet paper of legal size, as found in most law offices, was utilized by Mr. Ulrich and he noted thereon the details of information furnished by Mrs. Calhoun. These notes, consisting of 2 handwritten sheets, form an important *230 part of the facts we are to weigh and they are set forth at margin.[*]
Mr. Ulrich left the Evans home late in the afternoon of March 7th and returned with the prepared form of will on March 11th. He was accompanied by a partner, Attorney Lawrence, the purpose being *231 that of supplying an additional witness. It is apparent from the prepared form of the instrument that the scrivener intended a third witness should be summoned on occasion of intended execution. Such was done as presently noted.
The instrument was read to Mrs. Calhoun and it was thereupon executed according to statutory formalities.[**] Such formalities were duly attested by the testimony of Mr. Ulrich and Mr. Lawrence. Mrs. Pinion, daughter of the proprietress of the Evans Marshall home (Velma Evans), signed the instrument as third attesting witness. We shall refer to her testimony later. The instrument was executed in duplicate by all parties. One of the duplicates was given to and retained by Mrs. Calhoun and the remaining duplicate was retained by Mr. Ulrich. The instrument, if effective, wills Mrs. Calhoun's entire estate to the proponent nephews, Frank Rowe, Jr., and Glenn Rowe, subject to the conditions noted by Mr. Ulrich on occasion of the March 7th visit.
Following Mrs. Calhoun's death the executed instrument was duly submitted for probate and, on filing of notice of contest by the respective contestants, one being a brother and the rest being nephews and nieces of the decedent, such contest was certified to the circuit court as provided in the probate code. The contest came to jury trial before the Honorable Archie D. McDonald, circuit judge presiding, and resulted in jury verdict of disallowance. Proponents' motion for judgment notwithstanding the verdict, and their motion for new trial, were denied by the trial judge and judgment disallowing the instrument was entered.
The mentioned motions are here for test. We are asked to hold, by the appellant proponents:
*232 1. That the trial judge should have granted their motion, for entry of judgment upholding the instrument in contest as the decedent's last will and testament, notwithstanding the jury's verdict.
2. That the trial judge should have granted a new trial on assigned ground that the jury's verdict was contrary to the clear weight of the evidence received.
3. That the trial judge reversibly erred in jury instructions.
First: No motion for directed verdict was made during the trial. We cannot for want of such motion consider the mentioned motion for judgment notwithstanding verdict (Court Rule No 37, § 8 [1945], as amended April 1, 1953;[***]Forman v. Prudential Ins. Company of America, 310 Mich 145; Robb v. Booms, 337 Mich 583).
Second: The next question is whether the verdict below is contrary to clear weight of the evidence disclosed in the record. Admittedly an appellate court should be slow to overrule determination of a skilled trial judge in such regard. We realize that his position of judgment behind the plate is better than our spectral view through print from distant bleachers. Perhaps we should openly concede, as did Judge Frank of the United States court of appeals of the 2d circuit in his "Courts On Trial" (Princeton University Press, 1949), p 23, that:
"The trial court alone is in a position to interpret the demeanor  clues, this `language without words.' An upper court, to use Judge Kennison's phrase, `has to operate in the partial vacuum of the printed record.' A `stenographic transcript,' wrote Judge Ulman, `* * * fails to reproduce tones of voice and hesitations of speech that often make a sentence mean the reverse of what the mere words signify. The best and most accurate record [of oral testimony] *233 is like a dehydrated peach; it has neither the substance nor the flavor of the peach before it was dried."
For evident reasons our Court on rare occasion has held contrary to the trial judge's considered appraisal of evidence and verdict on motion for new trial. It is well that we have done so. Nevertheless, when the exceptional case comes here, we are left no alternative than that of exercise of stinted power. This is such a case. While we cannot and do not decide that proponents would have been entitled to an instructed verdict below had they moved for same, we are bound by constraining authority to hold that the verdict we now scrutinize rests at best on evidence of gossamer weight.
It was convincingly shown in the course of proponents' case that the instrument in contest was understandingly executed according to the previously-directed wishes of Mrs. Calhoun. The information shown in Mr. Ulrich's notes of March 7th came exclusively from the old lady and the text thereof discloses due knowledge on her part of property interest and the names of nearest of kin including each of the named contestants. The instrument is neither complicated nor unnatural. As drafted it is consistent in every respect with the facts and intentions that were given the attorney 4 days earlier and recorded then by him. When it is considered that wills, made by persons shown to have descended farther into the realm of eccentricity than Mrs. Calhoun did,[****] have been regularly upheld as a matter of law, analysis of this record to ascertain clear weight of the evidence must of necessity be guided *234 by that which was said in the oft-quoted case of Spratt v. Spratt, 76 Mich 384 at page 397, viz.,
"When no question of fraud or of undue influence is involved, but the question, is one solely of mental capacity, and the fact is shown that the testator wrote or dictated the will without being prompted, and the will itself is intelligible and consistent in its provisions, and disposes of all the testator's property, and there is nothing upon the face of it to indicate mental unsoundness, the testimony as to mental incapacity would have to be very strong and convincing to defeat such will. I do not mean to say that more than a preponderance would be required, but that the facts suggested make a very strong case in favor of mental capacity."
We turn from these premises to consideration of the testimony offered by contestants, starting with that of Mary Kathleen Pinion, the third attesting witness whose experience as an attendant of aged and incompetent people extended over a period of 6 precedent years. Mrs. Pinion was, as noted above, daughter of and assistant to the proprietress of the Evans home. The comprehensive summary of her testimony as given by contestants' counsel in their brief is as follows:
"Based on her experience, she expressed her opinion that Mrs. Calhoun was not mentally competent on either March 5, 1952, when she was admitted to the home, or on March 11, 1952, when she executed the will. Some of the facts which caused Mrs. Pinion to reach the conclusion that Mrs. Calhoun was mentally incompetent were as follows:
"She was extremely forgetful. She would forget things she was going to do. She would start out of the room and forget what it was she was going to do. She would forget where the bathroom was. Several mornings after she was admitted to the home on March 5, 1952, she woke up and did not know where she was.
*235 "Mrs. Pinion was asked expressly whether or not Mrs. Calhoun knew what she was doing at the time she executed her will, and she testified that Mrs. Calhoun had been confused on that day prior to executing the will. She believed that on that particular day Mrs. Calhoun had used a chair for the toilet. Mrs. Pinion further testified that she did not think Mrs. Calhoun was capable of handling her own financial affairs when she first came to the home; that in her opinion Mrs. Calhoun was confused from March 5, 1952 to March 15, 1952; that she was not sure that Mrs. Calhoun knew what she was doing; that instead of going to the stool in the bathroom she would use a straight chair; that she thought it was the morning of March 11, 1952, when she had an experience with Mrs. Calhoun when Mrs. Calhoun put her dress on, then her slip over the dress, and got angry at her shoes because she stepped the counters down and could not get the shoes to slip on. She did not think it was normal for a person to put her under garments on, then put her dress on, and then put a slip over the dress. In her opinion, such actions were not those of a normal or sane person.
"Mrs. Pinion further testified that while she saw Mrs. Calhoun sign the second page of the purported will and that she witnessed it, the will was not read in her presence. Mrs. Calhoun did not ask her to witness the will, and she did not know that the instrument she had witnessed was a will until that evening. The purported will was not read by Mrs. Calhoun, nor was it read to Mrs. Calhoun, in the presence of Mrs. Pinion. Mrs. Pinion testified that she told her mother that evening, when she found out that the instrument she signed was a will, as follows:
"`I stated that I didn't believe Mrs. Calhoun should be allowed to make it. I don't think she was competent to sign any papers.
"`Q. When did you decide that Mrs. Calhoun shouldn't have signed the will?
*236 "`A. When I found out it was a will. I said to my mother then that "I think if I had known that was a will, I would have asked them to go out and get someone else to sign and witness it."'"
We turn next to the testimony of the proprietress herself, Velma Evans. Here is the corresponding summary of her testimony as given in the brief for contestants:
"Velma Evans started the Evans Marshall Rest Home in February, 1948. She had been connected with nursing homes since 1933, and prior to that time had had 3 years training at Bethesda Hospital in Zanesville, Ohio. She had worked at the Mellus Hospital in Brighton, Michigan, and at the University Hospital. She testified that Glenn and Frank Rowe first brought Mrs. Calhoun to the Evans Marshall Home on March 1, 1952, and made arrangements for her admission. At that time Mrs. Calhoun seemed bewildered and left everything up to her nephews. Mrs. Calhoun entered the Evans Marshall Home on March 5, 1952, and all of the information placed on the admission card (contestants' exhibit 1) was furnished by Frank or Glenn Rowe. Glenn Rowe was designated as `nearest relative or friend,' and Mrs. Evans did not learn that Mrs. Calhoun had a living brother until late September or early October. Mrs. Evans testified from the chart (contestants' exhibit 2), showing that Mrs. Calhoun was admitted on March 5, 1952, at approximately 3 o'clock in the afternoon; that she was 82 years of age; was admitted with the assistance of her nephews; that her blood pressure was 218/100. She testified that a person of Mrs. Calhoun's age, build, height, and physical condition should have a blood pressure of 140/70. On the day of her admission, Mrs. Calhoun repeatedly asked Mrs. Evans if she could stay over night; that on the day of admission, Mrs. Calhoun was confused in her thoughts. Mrs. Evans testified that on March 6, 1952, between 7:30 and 8 o'clock, Mrs. Calhoun's roommate called to tell her that Mrs. *237 Calhoun was having trouble with her clothes. She observed that Mrs. Calhoun had put her dress on first and her underclothes on top of that; that she had difficulty with her shoes, trying to make her toes go in the heel of the shoes and the heels in the toe, and became angry when she could not get the shoes on and tossed them across the room. She testified that Mrs. Calhoun was a sick woman, physically and mentally.
"Mrs. Evans testified that she did not sit down by Mr. Lawrence; that she did not see Mrs. Calhoun read the will, nor hear it read, in whole or in part, to Mrs. Calhoun, or hear Mrs. Calhoun comment at all about what kind of an instrument it was supposed to be. She testified that it was her opinion that at no time during the period she was at the Evans Marshall Home was Mrs. Calhoun capable of handling any of her own affairs. Mrs. Evans testified that she was not present in the room when Mrs. Calhoun signed the will and she was never asked whether in her opinion Mrs. Calhoun was mentally able or competent to make a will. She testified that Mrs. Calhoun was not mentally competent from the 5th day of March until she died. She testified that in her opinion Mrs. Calhoun was not capable of knowing what money and property she had on March 5, 1952, nor did she think that on March 11, 1952, Mrs. Calhoun was capable of knowing what money and property she had, without someone prompting her or making some suggestions to her. She testified that on March 5, 1952, she thought Mrs. Calhoun was capable of knowing who her nearest relatives were, if prompted  her exact answer being as follows:
"`A. I believe that if you or I were to sit down and say to her, Mrs. Calhoun, so and so is your nephew, and if you refreshed her memory each time, she could tell you.'"
Whatever weight we are to accord the testimony of this witness (Mrs. Evans) is affected to marked *238 degree by several events that took place during the months after the testament in contest was executed, Mrs. Calhoun meanwhile remaining at the Evans home. On one occasion Mrs. Evans drove Mrs. Calhoun to the bank at Manchester "to draw enough money to pay me for the days she had been there," and on another occasion she (Mrs. Evans) with Mrs. Pinion drove Mrs. Calhoun to another bank in Ann Arbor to cash a check. On a 3d occasion Mrs. Evans drove Mrs. Calhoun to a bank at Hudson. Mrs. Evans testified, with regard to this trip to Hudson:
"I know the banker's name was Foster. She remembered that. I didn't know anything about her banking business, but I took her over there and when we got there the bank was closed and the next morning she had me call the banker and he sent her $700. I didn't pay any attention to her telephone conversation with the banker, but he sent her the money and I deposited it in an escrow account. She gave me the $700. She didn't asked for a receipt, but I gave her one. Later she became in arrears to me."
While Mrs. Evans and Mrs. Calhoun were in Manchester, as above mentioned, they agreed that Mrs. Evans would take a stove and refrigerator Mrs. Calhoun had (at a niece's home) in the way of credit on Mrs. Calhoun's account at the Evans home. Mrs. Evans narrated this business deal, between herself and an old lady she thought was not competent the previous March to understand a will, as follows:
"I went into the apartment with her, she needed to be helped  she wasn't steady on her feet  we sat down and in a few minutes she asked me if I was going to buy the stove and refrigerator. I said I would if she would like me to and that we would talk about it. We were alone. Mrs. Nichols was not able to walk and was in her living room. Mrs. Calhoun got up and asked me to take a look at the stove and refrigerator. After we got back home I asked Mrs. *239 Calhoun how much she wanted for the stove and refrigerator. She asked $80 for the refrigerator and $50 or $60 for the stove. The total price was $140. That was a fair price. She set the price."
The deal fell through for unexplained reason, yet it prompts reference in weighing Mrs. Evans' testimony to Rice v. Rice, 50 Mich 448, 453, as follows:
"But if a party has capacity to make a contract, and to bargain in respect to its terms with another who may be supposed to have an interest in getting the better of him, he must certainly have authority to execute, as his own voluntary and spontaneous act, a testamentary disposition of his property."
The remaining testimony which is said by contestants to establish mental incapacity need not be reviewed in specific detail. It is remote and vague and consists principally of unsupported opinions, all received without objection of counsel, to effect that Mrs. Calhoun wasn't "anywhere near normal" and "definitely I don't think she was capable of handling her own affairs" (witness Harry Burrell, nephew and contestant); that Mrs. Calhoun between March 1 and March 5, 1952, miscounted money in her purse as $95 when she actually had $87 and, during the same period, that she had to be physically lifted to the middle of her bed so she would not fall out (witness Sybil Burrell, wife of contestant Harry Burrell); that Mrs. Calhoun on an occasion between 1949 and 1951 forgot her money in a grocery store when she intended to make a purchase; that Mrs. Calhoun forgot on one occasion where she had placed her dustpan, and that she was not in full possession of her mental faculties prior to going to the Evans home (Alta Nichols, a disinterested witness); that Mrs. Calhoun's penmanship had deteriorated; that "she was slow in her speech and a little incoherent;" that she was not "exactly right the way she was talking" *240 in 1951; "that she had had a stroke or something that had affected her," and that she couldn't get around without a cane (witness Fred Rowe, brother and contestant); that it was difficult for Mrs. Calhoun to get around and that she had dizzy spells; that she was prone to repetition and to leave any subject under discussion for another, and that on an occasion in July, 1952, when Mrs. Calhoun was taken for a ride to see some friends she cried and had to be helped (witness Ralph Rowe, nephew and contestant), and that Mrs. Calhoun was confused as to her finances in that "she would tell us what it cost to stay (at the Evans home) and in a few minutes she would contradict herself" (Winifred Rowe, wife of contestant Ralph Rowe.)
Extending fair credit to this record of contestant testimony, and according it legal weight in our scales as against that which was offered in support of the presumption of mental capacity, we hold that this verdict is contrary to the clear weight of the evidence under venerable and valuable rules given in Spratt v. Spratt, supra. There the testator was an ill and elderly person. He was close to death and sent for a justice of the peace for testamentary purposes. His will was not, as here, prepared and finally executed in circumstances fortified as to contemplative care by a previous and accurately recorded visit of counsel. Yet this Court said, with respect to the weight of opinion testimony offered to establish mental incapacity on the part of Mr. Spratt (pp 390, 391):
"But what weight is opinion evidence entitled to where it appears that, unaided by any one, he does in fact make a will disposing of all his property, dictating consecutively the bequests and devises he sees fit to make to a large number of relatives, near and remote? What weight or reliance should be given to the opinion of persons, interested or disinterested, *241 professional or lay, to the effect that a person, who has in fact dictated a will disposing of all his property by successive bequests and devises, requiring consecutive thought and the exercise of memory, was unable to transact any matter of business which required for its completion several hours of time, recalling of various people and facts, or that he was mentally incapacitated to understand the nature and extent of his property, and the number and relation of those who were the proper objects of his bounty, so as to make a will devising his estate? The court rightly instructed the jury that there was no claim in the case that there was any fraud or undue influence practiced upon the testator in making the instrument; and he also instructed them that, beyond the questions incident to its execution, the only question was whether, at the time the will was executed by Mr. Spratt, he was competent to make it,  whether he was of sound mind.
"Now when, in the absence of fraud or undue influence, it is shown that the testator either wrote or dictated the will produced, the fact is established that he was capable, mentally and physically, of doing whatever the instrument shows was done; and the only question is, does the instrument on its face indicate that it is the emanation of an unsound mind, when applied to the facts and circumstances upon which, and under which, it was intended to operate, namely, the estate disposed of, and the manner of disposition?"
Language we have quoted from Spratt was adopted and applied to variant yet similar facts in In re Walz's Estate, 215 Mich 118, 122; In re Walter's Estate, 224 Mich 211, 215; In re Cottrell's Estate, 235 Mich 627, 632; In re Ferguson's Estate, 239 Mich 616, 627, 628; In re Littlejohn's Estate, 239 Mich 630, 633, 634; In re Aylward's Estate, 243 Mich 9, 16, 17; *242 In re Lembrich's Estate, 243 Mich 39, 45, 46; In re Dwyer's Estate, 251 Mich 346, 351; and In re Carmas' Estate, 327 Mich 235, 241. It is especially germane here  the instrument in question being of simple and easily-understood nature[*****] and there being nothing on face thereof or on face of the preparatory notes of counsel indicating unsoundness of mind when that instrument is considered with the circumstances of its intended effect.
The trial judge, in his opinion denying proponents' motion for new trial, relied particularly on the testimony of Mrs. Evans and accorded it more weight considering the rules of Spratt and Rice than it was entitled to receive, hence, reluctant decision here that the verdict below strayed from clear weight of the testimony and that a new trial is in consequent order.
Third: Proponents by timely and proper request to charge asked the trial judge to withdraw from jury consideration the issue of undue influence as made in the notice of contest. The request was not granted. Counsel for contestants concede that evidence of undue influence is wanting but allege that no issue on that score was made before the jury and that the omission was harmless. The requested charge should have been given (In re Williams' Estate, 185 Mich 97; Kneisel v. Kneisel, 143 Mich 384; Severance v. Severance, 90 Mich 417) and we decide the question because it may arise on retrial.
*243 No other error appears. Judgment reversed. New trial granted. Costs to proponents.
SHARPE, SMITH, BOYLES, and KELLY, JJ., concurred with BLACK, J.
DETHMERS, C.J., and CARR, J., concurred in the result.
EDWARDS, J., took no part in the decision of this case.
NOTES
[*] (Sheet No. 1 of Exhibit "A"  Ulrich notes)

Anna R. Calhoun  316 E. Ann, Ann Arbor 
 ------------ Both parents deceased 
 9655 | husband deceased 
 Mrs. Evans | No children  never adopted any 
 ------------
Fred Rowe  Near Traverse City, Michigan  brother.
Harriet Burrell  deceased  sister 
 Harry  lives at Denton  electrich in Ann Arbor
 Eva  Hudson, Michigan
 Edna  Detroit, Michigan  Morrell St.
 Florence Simms  Chicago, Ill.
 Roy Burrell  Detroit, Michigan
Frank Rowe 
 Glenn Rowe 
 Dorothy Cleveland, Ohio
 Ralph Rowe 
 Ed Rowe 
 Ormarol Rowe 
 Frank Rowe Jr.
 Want all of estate to Frank, Jr. & Glenn  if they survive,
 share & share alike  If Frank, Jr., predeceases Anna 
 want his share to go to his children. Glenn has no
 children now, but if he has any want them to take.
 Want Frank, Jr. & Glenn to be executors  no bond or nominal
 bond  and right to sell real estate without order of
 court.
 Lawrence, Ulrich  Tripp.
(Sheet No. 2 of Exhibit "A"  Ulrich notes)
 Real estate in Manchester  life estate only.
 All farms and house in Addison have been sold.
 So no real estate.
 No life insurance.
 There is a safety-deposit box in Hudson State Bank  $12,000
 U.S. Gov't Bonds
 about $1,400 Consumers Power stock: preferred.
Bank Accounts 
 Hudson State Bank  about $1,700  savings
 Hillsdale  Mr. Moule  $1,500  "
 There is a small checking account in the Manchester
 Bank  $300  400
 All household stuff  furniture, furnishings, etc. in
 Manchester.

[**] See CL 1948, § 702.5 (Stat Ann 1943 Rev § 27.3178[75]).  REPORTER.
[***] 335 Mich xlii. See, also, CL 1948, § 691.691 et seq. (Stat Ann and Stat Ann 1955 Cum Supp § 27.1461 et seq.).  REPORTER.
[****] See In re Johnson's Estate, 308 Mich 366 (followed in In re Thayer's Estate, 309 Mich 473; In re Hallitt's Estate, 324 Mich 654; In re Merrill's Estate, 326 Mich 351; and In re Kenealy's Estate, 336 Mich 657).
[*****] "If the testator sufficiently understands the short and simple will which he has made, it should not be set aside because he had not the capacity to understand the long and complicated one which he did not make" (italics by Court  Kempsey v. McGinniss, 21 Mich 123, 146).