*In re* ANDERSON ESTATE.

1. WILLS—UNDUE INFLUENCE—DISPOSITION OF PROPERTY.
    Undue influence that effects the loss of a testator's right to
    exercise freely his discretion in disposing of his property
    would invalidate the resulting will.

2. SAME—UNDUE INFLUENCE—BURDEN OF PROOF.
    Undue influence upon a testator is not to be presumed, but
    must be proved by the person seeking invalidation of the
    will.

3. SAME—UNDUE INFLUENCE—OPPORTUNITY—EVIDENCE.
    The mere fact that opportunity to exercise undue influence did
    exist is not sufficient, but it must be shown that it was exercised
    in such a fashion that the free will of the testator is re-
    strained and the will executed is not that of the testator but
    that of the person who influenced him.

4. SAME—MENTAL COMPETENCY—EVIDENCE.
    A testator has mental capacity to execute a valid will, where
    it is shown that he goes to an attorney and directs the draft-
    ing of a will disposing of his property in a fashion indicating
    he knows the property of which he is possessed, the objects
    of his bounty and has sufficient reason for the disposition
    made.

5. SAME—MENTAL COMPETENCY—EVIDENCE.
    Evidence that will was executed some 5 weeks after interview
    with attorney to whom testatrix had gone for having it drawn
    and had given him instructions to leave her personal property

REFERENCES FOR POINTS IN HEADNOTES

[1] 57 Am Jur, Wills § 352.
[2] 57 Am Jur, Wills § 386.
[3, 8] 57 Am Jur, Wills § 387.
[4] 57 Am Jur, Wills § 64.
[5] 57 Am Jur, Wills §§ 64, 139.
[6] 57 Am Jur, Wills §§ 78, 134.
[7] 57 Am Jur, Wills § 127.

to her only child, a son, and the life use of her farm with remainders over to proponent, a grandniece, and her 2 children, *held*, to have shown testatrix mentally competent to execute such a will, where it appears she knew her son and his wife were childless and would remain so and had concern about the ultimate disposition of her property among her own kin.

6. SAME—MENTAL COMPETENCY.
A will which was executed while the testator was competent to execute it is valid irrespective of his temporary condition before or after.

7. SAME — MENTAL COMPETENCY — HYPOTHETICAL QUESTION — EVIDENCE.
A hypothetical question to a psychiatrist, testifying as an expert in a will contest on the matter of testator's mental competency, which embraced or assumed facts that were not testified to, or omitted material facts which had been testified about or covered a period subsequent to that of the execution of the will or which related to facts not tending to show insanity or incompetency was objectionable.

8. SAME—UNDUE INFLUENCE—EVIDENCE—OPPORTUNITY.
Motion for directed verdict for proponent on ground that undue influence on her part had not been proven, should have been granted, where it appears that proponent, a grandniece of testatrix, had called upon testatrix frequently after the death of latter's husband and had driven her to the office of an attorney who prepared the will and later had it executed without proponent being present on either occasion, there being at most opportunity but no direct evidence of any undue influence.

CARR and KELLY, JJ., dissenting.

Appeal from Hillsdale; Arch (Charles O.), J. Submitted April 8, 1958. (Docket No. 4, Calendar No. 47,468.) Decided July 15, 1958. Rehearing denied September 9, 1958.

Grace Hall presented the will of Ollie G. Anderson for probate, admission of which was contested by Floyd Anderson. Verdict and judgment for contestant. Proponent appeals. Reversed and remanded.

*Kelly, Kelly & Kelly,* for proponent.

*Dimmers & MacRitchie,* for contestants.

KAVANAGH, J.   Ollie G. Anderson died December 8, 1955, at the age of 77, leaving a last will and testament dated August 15, 1938.   She had lived all of her life in Hillsdale county.   Her husband, Fred Anderson, died on December 24, 1937.   They had 1 child, the contestant, Floyd Anderson, age 49 at the time of the trial.   The will was prepared by attorney Paul Chase of Hillsdale, who was named executor therein, but who predeceased testatrix.   Grace Hall, proponent of the will, drove testatrix to see attorney Chase about 1 week after July 4, 1938.   Proponent was not present when testatrix discussed the drafting of the will with attorney Chase, nor was she present when the will was executed on August 15, 1938.

At the trial contestant admitted formal execution of the will.   Contestant objected to the admission of the will to probate on the grounds that testatrix lacked mental competency or capacity to make a valid will; that the will did not represent the will or desire of said deceased, but was induced by fraud and undue influence practiced upon said deceased by the proponent of the will.   The matter was brought on for trial in the circuit court of Hillsdale county and tried before a jury.

Mrs. Anderson and her husband had acquired during their lifetime a farm consisting of 107 acres in Hillsdale county, Michigan, and the usual personal property incident to the operation of a farm of this size.   By the terms of the relatively simple will of testatrix, the only child, Floyd, was given the personal property and the life use of the farm.   At his death it was devised to Grace Hall, a grandniece of the decedent.   In the event Grace Hall did not sur-

vive Floyd, then the farm was devised to 2 of Grace Hall's children.

At the close of contestant's proof, motion for directed verdict was made by proponent and decision thereon reserved under the Empson act.* At the close of all proofs, proponent renewed the motion for directed verdict, decision again being reserved. After verdict for contestant, motions for judgment notwithstanding the verdict and for new trial were made and denied.

So far as the question of undue influence is concerned, contestant's only evidence on this subject is the fact that shortly after the death of testatrix's husband, proponent, Grace Hall, frequently visited testatrix, and that proponent drove testatrix to the office of the attorney (who later drew her will) at the time of the original interview. There is no direct testimony of undue influence.

This Court has stated on several occasions that where there is no evidence of undue influence, it is erroneous to submit the question to the jury. *Blackman* v. *Andrews,* 150 Mich 322; *In re Calhoun Estate,* 346 Mich 227.

Undue influence exercised upon one who makes a will may become the basis for finding the will invalid, if by reason of that influence the right of the testator to freely exercise his discretion in disposing of his property has been taken away from him. Such influence is not to be presumed, but must be proved by the person seeking to have the will declared invalid. The mere fact that the opportunity existed for the exercise of such influence is not sufficient. It exists as a matter of law only when it is executed in such a fashion that the free will of the testator to dispose of his property as he sees fit is restrained in such a fashion that the will is not his own but that of the

* CL 1948, § 691.691 *et seq.* (Stat Ann § 27.1461 *et seq.*).

person who influences him. *In re Reed's Estate,* 273
Mich 334; *In re Hannan's Estate,* 315 Mich 102.

The second ground of contestant's case is that the
decedent lacked mental competency or capacity to
make a valid will. This is a far more difficult ques-
tion. This Court has had this question in all of its
aspects before it many times in the past. It is appar-
ent from reading the numerous cases that have been
presented to this Court that it is not unusual for con-
testants of a will to attempt to relive the life of the
testator through testimony of neighbors, relatives,
and friends to show the peculiarities of the testator:
personal likes and dislikes, grief over the loss of
loved ones, confusion and bewilderment on occasions
with respect to business matters, attachment to pets,
tendency to have as a part of his human makeup
those frailties which are the lot of fallen man, such as
temper, jealousy, harboring of grudges, inability to
agree with daughters-in-law, and the innate desire
to see his property descend only to his side of the
family, rather than to that of an in-law. In the
instant case, these and many other peculiarities sim-
ilar in nature were the subject of testimony by rela-
tives, friends, neighbors, and even individuals who
were not acquainted with the testatrix, over the
period from December, 1937, (the date of her hus-
band's death) to December, 1955, the time of the
death of testatrix.

Not satisfied with the appendices, we have re-
viewed the entire record. We do not find in it any
facts that substantiate the charge of incompetency
or incapacity to make a valid will.

To illustrate the type of testimony we have refer-
ence to, Anna Corey, a neighbor who had known Mrs.
Anderson for 40 years, stated that in 1938, after Mr.
Anderson died, there was a marked change in Ollie;
that there was an unusual amount of weeping on her

part; that when talking with her, she noticed that there were breaks in her conversation, and that Mrs. Anderson complained of pressure pains in her head.

Rex Curey testified that Mrs. Anderson would not allow him to return a machine which had been borrowed from the Anderson farm before Fred Anderson died, claiming that the machine did not belong to her.

Earl Hoyt testified that Mrs. Anderson did not have the mental capacity to make a will. He testified that he had interviewed her with reference to increasing the insurance on her buildings and she stated that the amount carried was sufficient.

Floyd Anderson, the contestant, testified that his mother, during her lifetime, did not handle the farm business matters, and after his father's death she referred the matters to him. He further testified that after his father's death his mother was in a great state of grief and shock; that she stated that she had an awful pressure in her head; that on 1 occasion she became incensed because his wife had bought him an electric razor and had purchased an $800 piano; that she complained to him that she believed that her daughter-in-law was a spendthrift; that she stomped on the flowers in her daughter-in-law's garden; that on 1 occasion she had decorated the graves of some of the farm animals previously buried; that on the death of her pet dog she had him make a casket and vault for the same; that she would constantly call him on the telephone any time of the day or night when she wanted something; that on 1 occasion she returned to the house during a minor fire, where he found her in bed with her dog, and where she thought she was perfectly safe, even though he had previously removed her from the house before calling the fire department.

All such matters have been before this Court on numerous occasions in will contest cases, and each has been held to have no bearing on the mental capacity of the deceased to make a will. *Spratt v. Spratt,* 76 Mich 384; *Prentis v. Bates,* 88 Mich 567; *Page v. Beach,* 134 Mich 51; *Hibbard v. Baker,* 141 Mich 124; *Blackman v. Andrews,* 150 Mich 322; *Leffingwell v. Bettinghouse,* 151 Mich 513; *In re Murray's Estate,* 219 Mich 70; *In re Littlejohn's Estate,* 239 Mich 630; *In re Johnson's Estate,* 308 Mich 366; *In re Calhoun Estate,* 346 Mich 227.

It is significant to note that the son, Floyd Anderson, contestant, was the recipient of a deed for an acre of land, upon which land his home was built in the year 1954, at which time he did not know the contents of his mother's will, and at a time when it was not convenient for him to allege her incompetency to make a deed.

The Court has said on several occasions that where a testator goes to an attorney and directs the drafting of a will disposing of his property in a fashion that indicates that he knows the property of which he is possessed and the objects of his bounty, and has sufficient reason for disposing of the property in the fashion he does under the will, such a testator has a mental capacity to make a will. In *In re Littlejohn's Estate,* 239 Mich 630, 634, this Court quoted with approval from *In re Ver Vaecke's Estate,* 223 Mich 419, 425, as follows:

" 'When a man goes to an attorney, and, without aid or suggestion, directs the provisions of his will, and furnishes specific descriptions of all the property he owns, it is a waste of time to discuss the question as to whether he was mentally competent to dispose of his property as he did.' "

In the instant case the record discloses that testatrix knew that her son and daughter-in-law would not

be able to have any children; that she had a concern
about what would happen to the property acquired
by testatrix and her husband in the event subsequent
to her death and that of her son Floyd the property
descended to her daughter-in-law.   She therefore
went to a practicing attorney, and without anyone
present she directed that the personal property
should be left to her son outright and that he would
have the use of the farm during his lifetime; that
on her son's death it would not go to the daughter-
in-law and her family, but that it would go to a
grandniece of testatrix or to the 2 children of the
grandniece in the event the grandniece did not sur-
vive Floyd.   This will speaks eloquently of the fact
that she could and did provide for the object of her
bounty, her son Floyd.   It also indicates that she
had knowledge of her property, and that consider-
able thought had been given to the disposition of it.
Her directions to her attorney to draft a will along
these lines indicate that she had the mental capacity
to make a will.   The fact that she waited from about
the 11th of July to the 15th of August indicates that
it was not something that was done on the spur of the
moment and without reflection.

This Court has several times held that if a testa-
tor was competent when the will was executed, it is
valid, irrespective of his temporary condition before
or after.  *In re Cottrell's Estate,* 235 Mich 627.  The
following cases were cited with approval therein:
*Pierce v. Pierce,* 38 Mich 412; *In re Weber's Estate,*
201 Mich 477; *In re Cochrane's Estate,* 211 Mich 370.

It should be noted that this case was tried before
the effective date of new section 16 of Court Rule
No 37* pertaining to hypothetical questions.

Only 1 more bit of testimony requires discussion,
that is the question of the submission of a hypotheti-

---

* See 349 Mich xiii.—REPORTER.

cal question to Dr. Rennell, psychiatric expert for contestant. The facts upon which the hypothetical question was based were not entirely supported by the evidence, and certainly the facts upon which the question was based had no tendency to show incompetency or incapacity of the testatrix at the time of the making of the will. In *In re Marx's Estate,* 201 Mich 504, this Court said:

"In proceedings to contest a will, a hypothetical question, propounded to a physician, which assumed facts not testified to, and omitted material facts which had been testified about, was properly rejected by the court below." (Syllabus 4.)

In *Mapes* v. *Berkowitz,* 304 Mich 278, this Court said:

"A hypothetical question may not embrace facts not supported by evidence." (Syllabus 2.)

In *In re Doty's Estate,* 212 Mich 346, this Court said:

"A hypothetical question as to testator's insanity, at the date of making his will, largely made up of the substance of incompetent testimony, which covered a period subsequent to that date, *held,* objectionable, and the answer thereto incompetent." (Syllabus 3.)

In the early case of *Prentis* v. *Bates,* 88 Mich 567, this Court said:

"A hypothetical question which, while mentioning some things which would possibly be evidence of some mental derangement, refers to facts which, standing alone or in connection with other things, have no tendency to show insanity or incompetency in a testator at any time, is incompetent." (Syllabus 9.)

The hypothetical question placed to Dr. Rennell was objectionable under all of these cases. Proponent's objection should have been sustained.

The motion for a directed verdict at the conclusion of all proofs should have been granted. The judgment of the lower court is hereby reversed and the matter is remanded to said court, with directions to enter judgment for proponent on the reserved motion, notwithstanding the verdict, with costs to proponent.

DETHMERS, C. J., and SMITH, BLACK, EDWARDS, and VOELKER, JJ., concurred with KAVANAGH, J.

KELLY, J. (*dissenting*). The Hon. Charles O. Arch, circuit judge of the county of Hillsdale, in his written findings denying proponent's motion for judgment notwithstanding the verdict of the jury, stated:

"A review of the testimony and other evidence in this case and of the pleadings of the respective parties convinces the court that there was evidence before it and the jury, which if believed, would support the verdict rendered."

I agree with Judge Arch, and, hence, this dissent.

Three special questions were submitted to the jury under the provisions of Court Rule No 37, § 6 (1945), and CL 1948, § 618.39 (Stat Ann § 27.1019). These questions were:

"Question 1. Was Ollie Anderson on August 15, 1938, mentally incompetent to make the will in question in this case by reason of an insane delusion or delusions, as claimed by the contestant in this case?"

The jury's answer was "yes."

"Question 2. Was Ollie G. Anderson on August 15, 1938, of sufficient mental competency to know and

understand the nature and extent of her property interests?"

The answer to this question was "no."

"Question 3. Was Ollie Anderson on August 15, 1938, capable of comprehending and appreciating the claim that her son, Floyd Anderson, had upon her bounty?"

The answer to this question was "no."

I believe the record sustains appellee's statement that:

"The instant case is unusual in the line of will contests for several reasons. In the first place, we have been unable to find any recently reported case where so many of the persons who intimately knew the decedent as friends and neighbors, were willing to come in and testify as to her mental condition. Nowhere in the recently reported cases have we found one where special questions were used as was the case here with the answers to all such special questions being adverse to proponent."

One of the persons who intimately knew the decedent was Earl Hoyt, a well-known insurance man in Blissfield, and who had been acquainted with decedent for many years. Proponent and appellant examined Hoyt and no motion to strike was made to the following questions and answers:

"*Q*. Mr. Hoyt, are you related to some of the parties in this room?
"*A*. No, sir   *   *   *
"*Q*. Is it your testimony, Mr. Hoyt, that on the 15th of August, 1937 (*sic*), when that will was actually made by Ollie Anderson she did not have the mental capacity to make a will and understand it, a will of that kind?
"*A*. In my opinion, yes.

"*Q.* In your opinion she did not have the mental capacity to understand and make that simple will?

"*A.* That is my opinion.

"*Q.* And you base that on those things you have told us here?

"*A.* I base it on my personal observation."

Gerald Kropscot testified as follows:

"*Q.* Did you know Ollie Anderson?

"*A.* Yes, we were acquainted with the Andersons shortly after I moved to Litchfield, when I was a boy.

"*Q.* Have you seen and talked to her on various occasions?

"*A.* Yes.

"*Q.* Have you seen and talked to her on occasions prior to the time her husband died?

"*A.* Oh, yes, I used to go there different times to exchange work, that is corn husking, when I was a kid at home, and I also used to work for Fred once in a while a day to help out when he was sick or something.

"*Q.* Now testimony in this case shows that Mr. Anderson, Fred Anderson, died in December, 1937. Did you have occasion in the summer of 1938 to go to that farm?

"*A.* Yes, I went out there in 1938 with the idea of trying to buy the farm.

"*Q.* Who did you go to talk to?

"*A.* Mrs. Anderson, Ollie.

"*Q.* You wanted to buy the farm, is that right?

"*A.* Yes. * * *

"*Q.* I will ask you whether or not you did purchase the farm?

"*A.* No, we did not. * * *

"*Q.* Now was there anything about her condition in 1938 and in 1945 when you talked to her that bore on your decision to purchase or not purchase the farm?

"*A.* Yes, I felt she wasn't in any shape to sell it. I didn't feel I wanted to buy it. * * * She wasn't

anything like she used to be when I used to go there prior to the time Fred died, a few years before that.

"*Q.* What was the difference, how can you describe the difference in her actions?

"*A.* Kind of hard to describe. She just didn't seem —she seemed confused and bewildered about everything."

Mrs. Hall, who takes under the will with her 2 sons, testified:

"*Q.* Let me ask you this: you went out to the home of Mrs. Lamn, didn't you?

"*A.* I did.

"*Q.* Didn't you ask Mrs. Lamn if she had read the will?

"*A.* I asked Mrs. Lamn if she knew about the will. * * *

"*Q.* Didn't you say the following too, in the presence of Mrs. Lamn, 'We have plenty, we don't need it.'

"*A.* No, Mrs. Lamn said that to me.

"*Q.* Didn't you say further, 'Why didn't she leave it to my mother, why me,' didn't you say that?

"*A.* Yes, I said they were closer.   *   *   *

"*Q.* All right. Now will you please answer this question for me, wasn't this statement made by you in the presence of Mrs. Lamn in her home, in a conversation that took place there, where the question of her mental competency had been brought up, didn't you say, 'Ollie Anderson had been losing her mind for a long time?'

"*A.* No, sir.   *   *   *

"*Q.* You did not say anything in Mrs. Lamn's home which would lead anyone to believe that there was any doubt in your mind about the mental competency of this woman, of Mrs. Ollie Anderson?

"*A.* No. I never did.

"*Q.* You didn't say in Mrs. Lamn's home that she had been losing her mind for years, or for a long time?

"*A.* No, sir, Mr. Dimmers, no.

"*Q*. And your testimony, you are willing your testimony should stand or fall on that, the truth of that answer you made, is that right?

"*A*. That's right.

"*Q*. That is all."

Verna Lamn testified as follows:

"*Q*. Do you have any interest in this case?

"*A*. No.

"*Q*. You haven't anybody who is a beneficiary of this will?

"*A*. No.

"*Q*. Now Mrs. Lamn, do you recall an evening in September of 1956 when Mrs. Grace Hall and her husband were at your home?

"*A*. Yes.

"*Q*. Were you discussing with her matters relating to this will, or did she discuss them in your presence?

"*A*. She seemed to want to know what I knew about it, that's the impression.  *  *  *

"*Q*. All right, what did she say to you.  Did she have a copy of the will there?

"*A*. Yes, she asked me if I had read it, and then she produced a copy from her purse and gave it to me to read.

"*Q*. What did she say there in addition?

"*A*. She said, 'I don't know why she did this, I didn't know anything about it.'  She said, 'Really she didn't leave me anything.  I am 9 years older than Floyd.'

"*Q*. What—

"*A*. Well the inference would be that she didn't give the property to Mrs. Hall, but to her 2 sons.  *  *  *

"*Q*. All right.  What else did she say to you?

"*A*. She said, 'We don't need it, we have plenty.'

"*Q*. Did she say anything about her mother?

"*A*. Yes, she said, 'Why didn't she give it to my mother, why to me?'

"*Q.* Now did she relate to you later in the evening anything about a conversation which she had, or anything about how the will was prepared, who took Mrs. Anderson to have it prepared?

"*A.* Yes, that was discussed.

"*Q.* What did she say about that?

"*A.* Well, at first she said she knew nothing about it, then later she said, 'I did take her, she called me, and I took her, but I didn't know anything about it, about the will, because I stayed out in the waiting room.' * * *

"*Q.* Well, you remember I asked her from the witness stand whether she had made a statement in your presence that Ollie had been losing her mind for a long time, or words to that effect. Do you remember that?

"*A.* Yes.

"*Q.* Now will you tell this jury if there was any statement made by her to that effect, and the circumstances concerning it; you said her husband was there?

"*A.* Yes. Mr. Hall asked me, he turned to me and said, 'When do you think she began losing her mind?' I didn't answer, and Mrs. Hall spoke up and said, 'She had been losing it for a long time.'

"*Q.* That is the statement of Mrs. Hall, who took the witness stand and said her case would rise or fall by that statement?

"*A.* Yes."

Arlene Anderson (daughter-in-law of deceased) testified:

"*Q.* Now while you are talking about Mrs. Hall have you had any conversations, or have there been any conversations in your presence with Mrs. Hall about the mental competency of Ollie Anderson?

"*A.* Yes, sir.

"*Q.* When was that?

"*A.* Well, back in 1938. We left our little house downtown, we still paid rent on it and had our furni-

ture down there, and as I walked into the house one day Ollie Anderson and Grace Hall didn't hear me enter the house, and when I reached the double doors into the living room Ollie was down on her knees pushing her hands into a little throw rug to show Grace Hall the sand in the rug, and I went on, and the next day Grace took me down to the house to see if our rugs were molding by being shut up, and we were talking about the things she had done, and Grace told me, 'Don't pay any attention to her, she's touched in the head. She is just like her sister, and her sister was crazy.'

"*Q.* This was in the summer of 1938?

"*A.* Yes.

"*Q.* Have you had any other conversation with Mrs. Hall when the mental competency of Ollie Hall [Anderson?] was discussed?

"*A.* Yes, a couple times. At the funeral, Grace and her family stayed at our place.

"*Q.* Whose family [funeral?]?

"*A.* Ollie's. Grace stayed at our house, and she said it was too bad Ollie had to go, but it was just as well, as long as she wasn't in any mental state to enjoy herself. She said 'After the death of Uncle Fred, Aunt Ollie hasn't been the same since,' and I said, 'I know, I lived with her, she acted like she cracked up,' and she said 'Yes, she did.' Like that. They came back the following Monday after we found out about the will, and Grace said, 'I told her to stay away from that cemetery, and join the church, do something that would take up her mind and get away from herself so she wouldn't be so depressed.' "

Deceased visited her cousin, Florence Wooden, once or twice a week. Florence Wooden testified:

"*Q.* Mrs. Wooden, you recall when her husband, Fred, died?

"*A.* Yes, sir.

"*Q.* What effect did that seem to have on Mrs. Anderson?

"*A.* Very bad.

"*Q*. You say very bad—can you describe by her actions, or what she did, what you mean by that?

"*A*. Well, her head, she complained so with her head.

"*Q*. She complained so with her head?

"*A*. Yes.

"*Q*. What did she say about her head?

"*A*. She said there was a pressure.

"*Q*. Those were the words she used, there was a pressure?

"*A*. Yes, sir.

"*Q*. Did this situation which you have described, exist in the year 1938?

"*A*. Yes, because she told me so.

"*Q*. She told you so?

"*A*. Yes.

"*Q*. Now will you tell us whether or not, whether you made any observations as to the way she would talk, whether she would talk coherently, or whether she made disconnected sentences, or stop in the middle of sentences, or what?

"*A*. Yes, in the middle of a sentence she would stop, then she would say, 'What was I talking about?'

"*Q*. Did you ever see her make any gestures towards her head?

"*A*. Yes, sir.

"*Q*. What did she do?

"*A*. She would grab it right here (indicating).

"*Q*. You have seen her do that?

"*A*. Yes, sir.

"*Q*. In the year 1938?

"*A*. Yes.

"*Q*. Now subsequent to the year 1938, let's take the year 1939, she visited your home?

"*A*. Yes, sir.

"*Q*. Was there—did that condition which you have described, the things she did, get any better or worse?

"*A*. They was getting worse.

"*Q*. Getting worse—what would you say, tell us as to whether or not that situation which you have

previously described, continued then during the next years and up to her death?

"*A.* It did.    *    *    *

"*Q.* Now you had an opportunity to talk with her on many different occasions?

"*A.* Yes, sir.

"*Q.* You have described her condition, is that right?

"*A.* Yes, sir.

"*Q.* Based upon your talking with her, your observation of her condition, the things which you have described, I will ask you whether or not you have an opinion as to whether or not she knew the nature of her property interests? I will say 1938?

"*A.* No, I don't think so."

In *Fabbro* v. *Soderstrom,* 252 Mich 455, 458, 459, this Court stated:

"The jury is the trier of the facts. If their verdict is against the clear weight of the evidence, it is the duty of the trial judge to correct it. He has an opportunity to do so in passing on a motion for a new trial. When he has weighed the evidence and approved of the verdict, this Court will not disturb it unless there are very clear reasons for doing so."

In *Schneider* v. *Pomerville,* 348 Mich 49, we said, at page 54:

"A jury's verdict-view of facts is entitled to an even higher degree of appellate respect than is a judge's verdict-view of the same facts, learned though the judge may be in law. For reasons known well to students of American history, a finding of fact by 'the twelvers' is more apt to be sound than that of one man."

In *In re Calhoun Estate,* 346 Mich 227, this Court considered a jury verdict for contestants in a will contest. We there stated (pp 232, 233):

"The next question is whether the verdict below is contrary to clear weight of the evidence disclosed in the record. Admittedly an appellate court should be slow to overrule determination of a skilled trial judge in such regard. We realize that his position of judgment behind the plate is better than our spectral view through print from distant bleachers. Perhaps we should openly concede, as did Judge Frank of the United States court of appeals of the 2d circuit in his 'Courts on Trial' (Princeton University Press, 1949), p 23, that:

" 'The trial court alone is in a position to interpret the demeanor—clues, this "language without words." An upper court, to use Judge Kennison's phrase, "has to operate in the partial vacuum of the printed record." A "stenographic transcript," wrote Judge Ulman, "fails to reproduce tones of voice and hesitations of speech that often make a sentence mean the reverse of what the mere words signify. The best and most accurate record [of oral testimony] is like a dehydrated peach; it has neither the substance nor the flavor of the peach before it was dried." '

"For evident reasons our Court on rare occasion has held contrary to the trial judge's considered appraisal of evidence and verdict on motion for new trial. It is well that we have done so. Nevertheless, when the exceptional case comes here, we are left no alternative than that of exercise of stinted power. This is such a case. While we cannot and do not decide that proponents would have been entitled to an instructed verdict below had they moved for same, we are bound by constraining authority to hold that the verdict we now scrutinize rests at best on evidence of gossamer weight."

I do not believe that this appeal presents one of those "rare" occasions, or one of those "exceptional" cases, referred to in *In re Calhoun Estate,* which would justify our holding "contrary to the trial judge's considered appraisal of evidence," and I dis-

agree with my Brother's conclusion that there was an absence of facts to substantiate the charge of incompetency or incapacity to make a valid will.

Reversible error was not committed in allowing Dr. Rennell to answer the hypothetical question, especially in view of the trial court's instructions to the jury, as follows:

"Now a person may have insane delusions, and may have many of them, but it may not affect his ability to make a will, or the making of a will. People may have insane delusions in certain fields, but not in these particular fields. People may be peculiar, they may have funny characteristics, and may be out of step with society, but that might not necessarily in and of itself affect their ability to make a will. The mere fact a person may be peculiar, they may be unique, they may be insane on certain things, and they may have certain delusions, but that in and of itself is not important. It must be, by a fair preponderance of the evidence, that they were in the realm of the will, and that they did affect her ability to make a will. Now she must not be subject to outside influence to the extent that it changed her wishes on the will. The mere fact someone had an opportunity to, as I said, is not enough. The mere fact that someone may have tried to is not enough. The question is whether they did. If they did assert or extend their influence to the degree that it changed the person's idea on the will, against their wishes, then it would be undue influence, and would not be their will, and would not be a valid will.    *    *    *

"When a scientific or expert witness testifies you should treat it in the same manner as any other testimony in the case. The mere fact that it was offered by experts does not compel you to take their testimony in preference to any other, but you should give such testimony the same consideration, everything else being equal, as that of any other witness.

"Now we had a rather long hypothetical question in this case. You are instructed that an expert witness, in answering a hypothetical question, assumes as true every asserted fact stated in the question. I therefore instruct you that if you find that the evidence fails to establish the truth of the asserted facts of the hypothetical question that you cannot consider the answers of the expert to that hypothetical question, but must disregard such answers."

The court did not commit reversible error in instructing the jury nor in submitting the question of undue influence. The answer to the special questions established beyond doubt that the jury verdict was not based upon undue influence.

Judgment should be affirmed. Costs to appellee.

CARR, J., concurred with KELLY, J.